# CHARLESTON.

MARY TABOR *v.* COMMERCIAL CASUALTY INSURANCE COMPANY

(No. 5875)

Submitted September 13, 1927.   Decided September 20, 1927.

1.   INSURANCE—*Intentional Injury, Brought About by Third Person, Not Caused by Insured's Misconduct or Assault, is "Accidental," Within Accident Policy.*

In the absence of a provision in an accident insurance policy relieving the insurer in such case, the latter is liable where the insured is intentionally killed or injured by another, and the injury is not the direct result of misconduct or an assault by the insured, but is unforeseen in so far as he is concerned; and the injury so inflicted is accidental within the meaning of the terms of the policy, "sustained solely through external, violent and accidental means."   (p. 166.)

(Accident Insurance, 1 C. J. §§ 77, 78.)

2.   SAME—*Death of Insured, Approaching His Slayer With Offensive Words, Committing no Overt Act of Violence, Will Not Preclude Recovery on Accident Policy.*

And where the insured, though approaching his slayer with offensive words and in a manner constituting a challenge to fight but committing no overt act of violence, has no reason to believe that the other intends to assault him with a deadly

weapon, or that he is in danger of death or great bodily harm, and is killed, his death at the hands of the other will not preclude recovery on such policy.   (p. 166.)

(Accident Insurance, 1 C. J. § 78.)

(NOTE:  Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, Mercer County.

Action by notice of motion for judgment by Mary Tabor against the Commercial Casualty Insurance Company of Newark, N. J.  Judgment for plaintiff, and defendant brings error.

*Affirmed.*

*W. H. Malcolm,* for plaintiff in error.

*J. E. Palmer,* for defendant in error.

MILLER, JUDGE:

This action, brought by notice of motion for judgment, was for recovery of the principal sum named in an accident policy, which insured against "the effects resulting directly and exclusively of all other means, from bodily injury sustained during the life of this policy solely through External, Violent and Accidental Means (Suicide, sane or insane, not included.)" The insured came to his death by reason of a gun-shot wound inflicted by one Gilbert Pennington.  Defendant filed its plea charging that "the deceased mentioned in said notice did not come to his death solely from external, violent and accidental means, but that his death was brought on by his own wrong and that he was killed in self defense and not an accident." After hearing all the evidence adduced by plaintiff and defendant, the trial court directed the jury to find for the plaintiff in the sum sued for, the principal sum named in the policy.

As evidence by his written opinion filed in the case and made a part of the record, the trial court found that there was no evidence of any overt act on the part of Tabor, the insured, which justified Pennington in firing the shot, and that, therefore, the killing was accidental as to Tabor.  The

finding is based largely on the testimony of Gilbert Pennington and his brother, G. R. Pennington.

Gilbert Pennington testified: "About half an hour before I went up there (to his father-in-law's) my wife—they were all gathered in there to make music, and my wife wanted to go up to hear it, I guess, and she got ready and dressed the children, and I told her I didn't want to go up there, and she sat down and commenced crying, and allowed I wouldn't go anywhere with her, and I told her, well, I would go a little while, but wouldn't stay long, and we went up and she sat down on the porch and I stood up in the front door, I don't know whether I went in the house or not, so we stayed, I reckon, about twenty minutes, and I am going home, I said, Ethel, you can stay until you get ready to come, and I picked up the two largest children, and she picked up the youngest and said, if you are going, I will, too, and we got into a quarrel, just a little family quarrel, it wasn't concerning nobody else, and she sat down first on a little rock step behind the house, (this was Pennington's own house) and was sitting there nursing the smallest child, and I said something and she answered me back, and I started to take the child and she said I couldn't have it, and I heard Tom Tabor, the boy I shot, and Fitzhugh Tabor, and Floyd Belcher and Al, all coming down the hill, and they passed the barn about forty yards away from my house, and I heard Tom Tabor say I will blow his damned brains out and watch them run out on the ground, and I got up and walked through the house and walked up to my father's and got the shot gun, and came back through the garden, and I heard Tom fussing with my brother, and I came around the corner, and Tom said, there comes the son-of-a-bitch, and throwed his hands up like this, I would say he throwed both of them up, and I fired." When asked why he fired the shot, Pennington answered: "By the threats he made when he passed the barn that he was going to blow my brains out and watch them run out on the ground." He did not say that he was actuated by any conduct of Tabor at the time he fired the shot.

G. R. Pennington testified that he was at home when he heard the "fuss raised"; that "Tabor came down to my

brother's house and asked my brother's wife what was the matter and she told him, but I couldn't hear what she said, and he went on up towards the house and said tell the son-of-a-bitch that I will beat hell out of him, and my mother said don't call him that, and he said come up here and I will beat hell out of you, and I got up and went to the house and I said, what's the trouble over, and he backed off from me four or five feet and said none of your damned business what it is over, and I didn't pay any attention to him, I just talked to one of the Belcher boys, and my brother came on up with the gun and came around the corner of the house, and he said let him come now, and Tabor moved his hands from his hip pockets towards the front and went walking towards him and my brother let him have the gun then. * * * He was standing about five feet from me—I will say about five feet from—ten feet from the corner of my brother's house, with his hands in his hip pockets. I don't know whether the boy had anything or not. I tried to settle the trouble, you know. * * * His hands were in his hip pockets and my brother said let him come, I will fix him, or something that way, and he moved his hands from his hip, this way, from his hip pockets to the front this way and went walking towards him. * * * He never said anything at all that I heard.''

Mrs. Pennington testified that after she and her husband left his father-in-law's home, he began cursing her, and accused her of being intimate with a Stevenson boy; that he picked up a stick after she sat down on a stone near their home, and threatened to kill her; that her brother, Tom Tabor, the deceased, and other members of the family, hearing her cries for help, came down the hill to where she was sitting with her baby in her arms. At this time Gilbert Pennington had gone into the house. Mrs. Pennington says that her brother, Fitzhugh Tabor, ''walked out into a field to call Joe Stevenson, and he called my husband a son-of-a-bitch, and my husband's mother told him not to call her son that, that he wasn't that, and to not call him that, and just about that time I saw my husband come around the corner of the house, just got a glimpse of him, it was dark, and I knew

who it was but I didn't see any gun in his hand, and about that time he fired.''

The evidence is that Pennington was gone seven or eight minutes from the time he left his wife until he returned with the gun, and that he shot Tabor immediately upon his return. No one except Gilbert Pennington testified to hearing the remarks by Tabor about blowing some one's brains out, and he did not say that his name was mentioned in that connection; and there were others nearer Tabor at the time with equal or better opportunity to hear him. Gilbert Pennington testified that Tabor threw his hands up just before the shot was fired; G. R. Pennington, that he brought them forward from his hip pockets. Tabor was not armed; and there is no evidence that anyone present had any thought that he might be. He was in his shirt sleeves at the time, and other witnesses say that he had his hands before him, with his thumbs between his belt and shirt. An examination of the body after the homicide showed that his belt was shot off, and that a number of shot had pierced his thumbs and fingers. But one shot was fired.

The rule of law is well-established, that in the absence of a provision in an accident policy relieving the insurer in such case, the latter is liable where the insured is intentionally killed or injured by another, and the injury is not the direct result of misconduct or an assault by the insured, but is unforseen in so far as he is concerned, and that the injury so inflicted is accidental within the meaning of such policy. *Employers' Indemnity Corporation* v. *Grant,* 271 Fed. 136, 20 A. L. R. 1118, and note pp. 1123-27; *Lovelace* v. *Travelers' Protective Asso.,* 126 Mo. 104, 47 Am. St. Rep. 638, and note; *Standard Accident Ins. Co.* v. *Walker,* 127 Va. 140.

And, where the insured, though approaching his slayer with offensive words and in a manner constituting a challenge to fight, has no reason to believe that the other intends to assault him with a deadly weapon, or that he is in danger of death or great bodily harm, and is killed, his death at the hands of the other will not preclude recovery on an accident policy. *Union Casualty Company* v. *Harrold,* 98 Tenn. 591, 60 Am. St. Rep. 873, and note; *Insurance Co.* v. *Bennett,*

90 Tenn. 256, 25 Am. St. Rep. 685; *Adams* v. *Cowles,* 95 Mo. 506; *Bradley* v. *Mutual B. L. Ins. Co.,* 45 N. Y. 432; *Lovelace* v. *Protective Asso., supra.*

The test seems to be: Did the insured appreciate that, by doing the act, he was putting his life and limb in hazard? 14 R. C. L. 1257; *Smith* v. *Life Ins. Co.,* 115 Iowa 217, 91 Am. St. Rep. 153; *U. S. Mut. Accident Asso.* v. *Hubbell,* 56 Ohio St. 516, 40 L. R. A. 453. And this rule was applied by this court in *Beard* v. *Insurance Company,* 65 W. Va. 283, where the policy provided that it did not cover any injury occasioned, wholly or in part, directly or indirectly, by voluntary or negligent exposure to unnecessary danger.

From the evidence before us, could it be inferred that Tabor should reasonably have expected that he was placing himself in danger of life or great bodily harm by the threats he is said to have made as he passed the barn, forty yards from Pennington's residence, if in fact he made such remarks as Pennington testified to? No doubt he was angry at the time; but had he not a right to be? He was answering the call of help from his sister, who testified that she feared her husband, and that he had picked up a stick and threatened to kill her. Others heard her cries for help, and came to her home, not only her relatives, but her husband's also. Tabor's words were ostensibly the result of his feelings because of Pennington's action towards his wife. He could not reasonably anticipate that coming to her aid, though he expressed his feelings with threatening words, would bring on the fatal results that followed. Pennington testified that he shot, and shot to kill, because of the threats made by Tabor when coming by the barn, some forty yards away. He deliberately went after the gun, and fired immediately upon returning. He does not claim that he fired the shot because of any act of Tabor at the time. His brother, G. R. Pennington, testified that when Gilbert came up with the gun, he said, "Let him come now," and fired immediately. He does not say that Tabor said a word, only that "he moved his hands from his hip pockets towards the front and went walking towards him." Gilbert Pennington said that Tabor threw up his hands; and his right to protect himself must be meas-

ured by what he saw, heard and thought, not by what others saw.

Under this evidence Pennington was not justified in shooting. "Mere words or threats unaccompanied by an overt act do not constitute ground of justification or excuse of a homicide, under the law of self defense, and an instruction treating them as such is properly refused." *State* v. *Snider,* 81 W. Va. 522. And in this case the probable result to be anticipated by the insured must be considered, not alone the anticipation of danger by the person threatened, for if the insured did not and had no reason to expect he would be assaulted with a deadly weapon, his act would not bar recovery on the accident policy, under the law as laid down in the cases above cited.

We are of opinion that there is no appreciable evidence in the record to support the theory of the defendant that Tabor came to his death by his own wrong; and that the trial court, therefore, properly directed a verdict for the plaintiff.

The judgment will be affirmed.

*Affirmed.*