PETERSON *v.* AETNA LIFE INSURANCE CO.

INSURANCE — GROUP POLICY — "ACCIDENTAL" DEATH — CULPABLE PROVOCATION.

Insured who pointed gun at a widow and threatened to kill her and her family and was himself killed by widow's adopted son culpably provoked or induced the act causing death, hence the result was not accidental under terms of group insurance policy entitling beneficiary to sum for "death sustained solely through external, violent and accidental means," independently of all other causes."

Appeal from Kent; Hoffius (Cornelius), J. Submitted January 16, 1940. (Docket No. 110, Calendar No. 40,954.) Decided March 15, 1940.

Action by Elizabeth S. Peterson, assignee of Marian Gleason, formerly Marian Peterson, against Aetna Life Insurance Company, a foreign corporation, for sums due under the terms of an insurance policy for accidental death. Judgment for defendant. Plaintiff appeals. Affirmed.

*John M. Dunham,* for plaintiff.

*Travis, Merrick & Johnson,* for defendant.

Bushnell, C. J. Plaintiff is the assignee of the former wife of Floyd Peterson, deceased. Defendant insurance company issued a group policy to Peterson's employer. The policy provided that those employees of the group to which Peterson belonged would be insured "for the principal sum of $1,000 in the event of death sustained solely through external, violent and accidental means, independently of all other causes." Defendant paid the life policy but refused to pay upon the accident policy on the ground that Peterson's death was not occasioned solely through accidental means. The trial court, sitting without a jury, entered a judgment of no cause of action, from which plaintiff appeals.

For some time preceding his death, Peterson had been calling on Mrs. Gee, a widow at Whitehall, Michigan, to whom he had proposed marriage. On the Thursday before Peterson's death, he went to Whitehall to spend the weekend. On Sunday, Mrs. Gee and Peterson went to a neighbor's home for dinner, stayed all afternoon, and returned home about 11 o'clock in the evening. Peterson had been drink-

ing all during the afternoon and, on his way back
to the Gee home, he stopped at a tavern and had
four bottles of beer. While Mrs. Gee and Peterson
were at the tavern, her adopted son, Foster, came in
and said that his grandmother was ill. Mrs. Gee
told Foster that she would be home soon and, after
he left, Peterson accused the son of spying on them
and became very disagreeable. When they arrived
home, Peterson became more abusive, got a revolver,
and threatened to kill Mrs. Gee and her family. Ac-
cording to Mrs. Gee, he was yelling and screaming
so that he could be heard on the street. He ordered
Mrs. Gee into the sunroom, made her sit in a chair
facing him, and kept her covered with the revolver,
continuing his abuse, and invited the grandmother
and Foster to stick their heads around the door and
he would shoot them off, saying, "I am just waiting
for the chance." When Mrs. Gee remonstrated with
him, saying, "You wouldn't shoot either mother or
Foster," he said, "Oh, I wouldn't, wouldn't I? I'll
clean up the whole family. I kill you first and you
won't be here to protect them and run after them."
Mrs. Gee said he raised his gun and took aim at her,
and then she heard a shot, after which Peterson's
gun dropped to the floor and she saw blood on the
side of his head. She ran into the living room, laid
the gun on the desk, and met her son Foster, and
asked, "Oh, Foster, did you do that or who did
that?" He replied, "Mother, I had to do it or you
wouldn't be here now."

The trial judge stated in a written opinion that
Foster shot Peterson in defense of his mother and
to save her life, saying:

"Peterson could have anticipated that he might be
halted or stopped in his murderous attack by any
person, not necessarily Foster Gee only, since the law

gives protection from felonious assault, even to the extent of taking the life of an aggressor, to save the life of an innocent victim who is in imminent danger of death. A person is presumed in law to intend the consequences of his overt act knowingly done by him. No man can look into the mind of another. But, where an act is knowingly committed which leads to certain legal consequences, the court or jury trying the facts has the right to draw inferences that certain results were intended. The law presumes every person to intend the usual consequences of his act. Peterson intended to kill, but was himself killed while in the commission of a murderous assault. This was the consequence of his culpable, overt act, knowingly done by him.

"The means or causes of death as disclosed in this record were not accidental. The insured voluntarily rushed into this vicious, criminal assault with a deadly weapon. The consequences that followed were to be expected. He provoked it. The record is barren of any provocation offered by the mother or son, or any other person."

Appellant complains of the admission, over objection, of the testimony of Mrs. Gee as to what her son Foster said to her after the shooting, and contends that the trial judge should have found that Peterson came to his death as the result of external, violent, and accidental means, independent of all other causes.

In *Meister* v. *General Accident, Fire & Life Assur. Corp., Ltd.,* reported in 92 Ore. 96 (179 Pac. 913, 4 A. L. R. 718) the court said:

"We think it very clear that, if a man deliberately assaults another with a lethal weapon in his hand, such as a pistol, whether it be loaded or not, it cannot be said that the injuries he receives in the resulting struggle are accidentally received. The very act of assaulting another with a gun is an invitation

to that other to resist unto death, and if the aggressor is killed, it is a natural and logical sequence of his own voluntary act."

In the annotation following this case, authorities are discussed, including *Taliaferro* v. *Travelers' Protective Ass'n,* 25 C. C. A. 494 (49 U. S. App. 275, 80 Fed. 368), which distinguishes *Lovelace* v. *Travelers' Protective Ass'n of America,* 126 Mo. 104 (28 S. W. 877, 30 L. R. A. 209, 47 Am. St. Rep. 638).

See, also, *Tabor* v. *Commercial Casualty Ins. Co.,* 104 W. Va. 162 (139 S. E. 656, 57 A. L. R. 968), and *Gilman* v. *New York Life Ins. Co.,* 190 Ark. 379 (79 S. W. [2d] 78, 97 A. L. R. 755), and accompanying annotations.

Defendant's brief contains a reference to other authorities cited in *McCrary* v. *New York Life Ins. Co.* (C. C. A.), 84 Fed. (2d) 790. In the *McCrary Case* the court quoted with approval the following statement from *Interstate Business Men's Accident Ass'n of Des Moines, Iowa,* v. *Lester* (C. C. A.), 257 Fed. 225, 230:

" 'The line of distinction is this: If the party does something which culpably provokes or induces the act causing his injury or death, then the result is not accidental; but, if he is wholly free from culpability himself, the result is accidental as to him, though it may have been within the deliberate intent of the aggressor.' "

The court added:

"This distinction is recognized and observed in most of the adjudicated cases. An insured who meets death in an affray in which he was the aggressor cannot ordinarily be said to have suffered his injuries as the result of an accident, for he must be held to have foreseen the result of his wrongful acts."

In the instant case, Peterson threatened to kill Mrs. Gee and her family. He held a gun in his hand, pointed at her, and shouted his threats loud enough to be heard in the street. Peterson must be held, as a matter of law, to have expected someone to come to the rescue of Mrs. Gee and to protect her life to the extent of taking his if necessary. It is immaterial whether or not Peterson knew that Foster Gee was in the house or that Foster had a gun. He was within his rights in protecting his mother from a murderous assault. It cannot be held that Peterson's death was accidental. It is unnecessary to consider the claimed hearsay testimony of Mrs. Gee in order to arrive at this conclusion.

The judgment of the trial court is affirmed, with costs to appellee.

Sharpe, Potter, Chandler, North, McAllister, Wiest, and Butzel, JJ., concurred.