## Richmond

MABEL WOODEN, ETC. v. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, ET AL.

January 18, 1965.

Record No. 5819.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Paul M. Lipkin* and *Samuel Goldblatt* (*Goldblatt & Lipkin,* on brief), for the plaintiff in error.

*John M. Hollis* (*Willcox, Cooke, Savage & Lawrence,* on brief), for the defendants in error.

SPRATLEY, J., delivered the opinion of the court.

This proceeding was instituted by Mabel Wooden, sometimes hereinafter referred to as plaintiff, against the John Hancock Mutual Life Insurance Company, hereinafter called John Hancock, H. R. M. A.—I. L. A. Welfare Fund and the Hampton Roads Maritime

Association. The plaintiff claimed that as the beneficiary of a group life insurance policy issued by John Hancock on the life of her brother, James H. Robinson, of the face value of $3,000.00 in the event of his natural death, and an additional $3,000.00 in case of accidental death, she was entitled to recover $6,000.00 from the insurer, because James H. Robinson died on December 9, 1962, as a result of an accident.

Leavean Robinson also brought suit in the same court against the same defendants claiming that she was the beneficiary of the policy above mentioned. Thereupon, John Hancock filed its bill of interpleader, depositing $3,000.00 to the credit of the court, in full payment under the policy, denying that the death of Robinson was accidental within the terms of the policy provisions.

The actions at law and the interpleader were consolidated and tried by the court, without a jury, with the consent of all parties.

The court, after hearing the evidence, held that Mabel Wooden was the lawful beneficiary of the insurance policy; that the death of the insured was not by accidental means within the provisions of the policy; and that Mabel Wooden was entitled to the $3,000.00 deposited in court by John Hancock; and accordingly entered judgment for the plaintiff. The remaining defendants were dismissed from the proceedings as not being interested parties. Mabel Wooden excepted to so much as denied her the recovery of an additional $3,000.00 for accidental death, and perfected this appeal.

Since the evidence largely presents a factual question, the facts must be set out somewhat in detail, and in the light most favorable to the plaintiff in view of the judgment in her favor.

John Hancock issued, effective as of January 1, 1962, a group life insurance policy under the terms of which James H. Robinson was insured in the amount of $3,000.00, with an additional $3,000.00 payable if the insured lost his life "as a result of bodily injuries sustained solely through external, violent and accidental means, directly and independently of all other causes." Leavean Robinson, described as the wife of the insured, was originally designated as the beneficiary. She and James H. Robinson were divorced on September 25, 1962. On December 1, 1962, Robinson designated Mabel Wooden, his sister, as the beneficiary of the policy, superseding his former wife.

On December 9, 1962, Leavean Robinson, accompanied by her son, James H. Robinson, Jr., attended services at a local church. At that service, it was announced that James H. Robinson was present.

At the conclusion of the services, Leavean Robinson returned to her home. James, Jr., who had talked with his father, James H. Robinson, at the church, suggested that they visit a sick daughter of Robinson, Sr. This they did, and at the completion of that visit, James, Jr., suggested that he and his father go across the street and visit his mother. Thereupon, the father, the son, and a young daughter of James, Jr., went to the home of Leavean Robinson.

Leavean had returned home emotionally upset because of something she heard at the church service, or had "dreamed." She was crying when the three Robinsons came to her home. Winifred A. Applewhite, a seventeen-year-old granddaughter of Leavean, was present in the house. The four remained there from ten to twenty minutes. When James H. Robinson, the insured, started to leave, he engaged in a scuffle with Leavean for the possession of a gun, and as a result he was shot and killed.

Fred Henley, a police officer who investigated the circumstances surrounding the death of James H. Robinson, called as a witness on behalf of Mabel Wooden, testified upon examination by her counsel, that Leavean had made a statement to him concerning the shooting almost immediately thereafter, which he had reduced to writing and which she signed. Testifying from his written notes, without objection, he said that Leavean told him that "James and James, Jr. came over to the house, James started talking. He started arguing. Said he was living and that he didn't never care about me and the children and raised his voice like he always do. I couldn't say much because I was still crying. Then I said he should have did something for Ralph, and he said he had some change that he would give him. Then he started screaming and yelling louder and put his hand on his hip like he always do. Then he looked at the gun and I looked at the gun that was laying on the table near the door. Then the both of us grabbed for it. I got the gun first and he grabbed part of it and my hand, and he had part of it and I had part of it, and we were wrestling and twisting for it. Then there was a loud explosion. I thought I had got shot because he still had his hands on me."

Henley stated that the gun or revolver was a ".32 caliber Savage automatic," a gun of an old make, which had to be cocked by pulling back the hammer before it could be fired. It would thereafter "fire in a semi-automatic condition by touching the trigger."

Robinson was shot in the chest. He left the house, walked across the street, collapsed, and died in the front yard of a nearby house. Powder burns on his clothing indicated that he had been shot at

close range. Leavean had a slight flesh wound on her left shoulder, caused by a bullet fired from the same gun during the affray.

Leavean Robinson's testimony, as a witness at the trial, differed in some particulars from the statement she gave to the police officer. She first denied that she told the officer that the deceased "started arguing," or that he "did not care about her or the children." Later, she modified her denial, saying that she didn't remember making those statements. She admitted that she did say to her ex-husband prior to the shooting that, "Since you are living so nice, give Ralph something."

Leavean said she married the deceased in 1928; that six children were born of the union, five of whom were living, including Ralph, a seventeen-year-old, retarded child, who lived with her; that she and Robinson separated in 1958, and were divorced in 1962, at which time Robinson had agreed to pay to her $20.00 per week for the support of Ralph; that, at the time of the shooting, he was more than six months in arrears of the promised payments, most of those made being short $5.00 or $10.00 per week; and that she had written to him and talked to him over the telephone about his failure to live up to his agreement. She added that she and the deceased had had "arguments" and she had suffered at his hands "brutal beatings over the years."

Leavean also said that she was surprised when her former husband and son, James, Jr., came to her house on December 9, 1962. She was in her kitchen preparing dinner, and she asked him to stay to dinner. He declined, saying he was going over to his mother's. She said "We had a few words. I mean a conversation;" and that he then put his hands under the lapels of his coat and said: "I'm living and I'm living good," as if to "emphasize" that "he had plenty of money or something." When she asked him to help Ralph, he said he had some change that he would give him. Said she: "I saw him looking in a fixed way at something, I looked too, and he was looking at the gun on the coffee table." * * *. "And when he looked and saw I was looking at him, then he reached for the gun. I don't know what he meant—now, he had been sick, but he reached for the gun as though he was going to take it, so I reached for the gun and both of us—he grabbed me and I grabbed him, and the gun exploded."

She explained that she kept the pistol in the house for protection from night prowlers and had brought it from her bedroom that

morning and put it on a table near the door when she went out to get her newspaper, and that she had forgotten to take it back upstairs.

When asked why she reached for the gun, she replied: "I grabbed it to keep him from hurting anybody in the house. * * * I went for it because I didn't want him to do anything foolish with it. * * * There were certain reasons in the past, I think, that made me think that he might do something with it. * * * I mean I didn't know just what his thoughts were. I thought he miscalculated, * * *. He grabbed for the gun first and I put my hand right under his and grabbed it. He grabbed me by force and grabbed my hand and twisted my arm around and did everything within less time than a minute. It was a struggle. Both of us had our hands on the gun. I didn't want him to hurt anybody, my grandbaby was there, my son was there and me, and I didn't want him to hurt anybody."

The only other witness who testified as to the events leading up to the shooting was James H. Robinson, Jr. He said that with his young daughter in his arms, he was walking toward the door when he heard a scuffle, and the voice of his father uttering an oath, saying "God damn or God something," talking to his mother; that he knew at some point while he was in the room, "that things were not all peaches and cream;" and that "I saw hands moving in a struggle and then when I did get my composure the gun went off and I proceeded towards my parents." He saw his mother fall to the floor, his father rush out of the house, and across the street. He picked up the gun from the floor; but didn't know which of his parents had dropped it.

Summarizing, we have here a long background history of friction and hostility between Leavean Robinson and the deceased; a discussion or argument partly over the deceased's failure to perform his agreement to furnish support for a retarded child of the couple; evidence that he first undertook to obtain possession of the pistol; that Leavean feared that she or some member of her family would be hurt; a struggle for the possession of the pistol which resulted in the death of the aggressor. The evidence, as a whole, satisfactorily shows that Robinson, the insured, was the aggressor; that he brought on the circumstances and consequences which caused the struggle for the gun and ended with his death, a result which he could, or should, have reasonably foreseen.

In *Smith* v. *Combined Insurance Company of America*, 202 Va. 758, 761, 120 S. E. 2d 267, we approved the following definition:

"'*Accident:* An event that takes place without one's foresight or

expectation; an undesigned, sudden, and unexpected event; chance; contingency, often; an undesigned and unforeseen occurrence of an afflicted or unfortunate character; casualty, mishap; as, to die by accident.' "

" 'The generally accepted rule is that death or injury does not result from accident or accidental means within the terms of an accident policy where it is the natural result of the insured's voluntary act, unaccompanied by anything unforeseen except the death or injury.' " 29A Am. Jur., Insurance, § 1167, page 313. See also 45 C. J. S., Insurance, § 753-b, page 781.

We also quoted with approval the principle stated in *Scarborough v. World Insurance Company*, 244 N. C. 502, 94 S. E. 2d 558, 561:

" 'Where the policy insures against loss of life through accidental means, the principle seems generally upheld that if the death of the insured, although in a sense unforeseen and unexpected, results directly from the insured's voluntary act and aggressive misconduct, or where the insured culpably provokes the act which causes the injury and death, it is not death by accidental means, even though the result may be such as to constitute an accidental injury. 45 C. J. S., Insurance, § 753, p. 779.' "

In *Smith* v. *Combined Insurance Company of America, supra*, we conclude that:

"In accord with this principle it is generally held that if the insured voluntarily provokes or is the aggressor in an encounter, and knows, or under the circumstances should reasonably anticipate, that he will be in danger of death or great bodily harm as the natural or probable consequence of his act or course of action, his death or injury is not caused by an accident within the meaning of such a policy." 202 Va., *supra*, 761.

"One who assaults another, or voluntarily enters into an affray and is hurt, has not suffered an accident." *Mutual Benefit Health & Accident Ass'n* v. *Ryder*, 166 Va. 446, 450, 185 S. E. 894, 896. *Beckley National Exchange Bank* v. *Provident Life & Accident Insurance Co.*, 121 W. Va. 152, 2 S. E. 2d 256; Couch, Cyclopedia of Insurance Law, Vol. 5, § 1158, p. 4068.

In *Koester* v. *Mutual Life Insurance Co.*, 36 Del. 537, 179 A. 327, 329, this is said:

"In a struggle to obtain possession of a loaded firearm * * * the discharge of the weapon during the struggle was not an unforeseeable or unusual result. It was a natural consequence of the effort made by the insured to obtain the weapon, and might well have been expected

as probably apt to occur during the course of the struggle. This voluntary attempt of the insured, we think, was the direct cause of his death. If there had been no such attempt by the insured, there would have been no such injury to him. Therefore his death was not caused by accidental means within the meaning of the policies of insurance."

In *Perringer* v. *Metropolitan Life Insurance Co.*, 241 Mo. App. 521, 244 S. W. 2d 607, 617, an action for recovery on an insurance policy because of insured's death, which occurred when he was shot in a scuffle, the court said:

"It surely must have been within his (the insured's) reasonable anticipation and foresight to assume that she would resist as much as possible. If in the scuffle to protect herself, he was killed, though not with the intentional discharge of the revolver, his death was not caused by 'accidental means,' within the provisions of the policy and there can be no recovery."

Applying the principles stated to the facts in evidence, we agree with the holding of the trial judge that James H. Robinson, the insured, did not come to his death "as a result of bodily injuries sustained solely through external, violent and accidental means, directly and independently of all other causes," and hence his beneficiary was not entitled to recover under the accidental indemnity provision of the insurance contract.

The judgment of the trial court is

*Affirmed.*