**Deborah J. WALKER, by Patricia Walker Sayre, her mother and next friend, William D. Walker, by Patricia Walker Sayre, his mother and next friend, and Patricia Walker Sayre, Plaintiffs,**

v.

**METROPOLITAN LIFE INSURANCE COMPANY, a corporation, Defendant.**

No. 2222.

United States District Court
S. D. West Virginia,
Huntington Division.

Aug. 29, 1967.

Chad W. Ketchum, Greene, Ketchum, Baker & Pauley, Huntington, W. Va., for plaintiffs.

R. Kemp Morton, Huddleston & Bolen, Huntington, W. Va., for defendant.

CHRISTIE, District Judge.

This diversity action, commenced in the Circuit Court of Wayne County, West Virginia, and removed here in accordance with the provisions of 28 U.S.C.A. Sections 1332 and 1441(a), has been submitted to the Court upon stipulation, and it concerns the recovery of double indemnity benefits under a life insurance policy issued by the defendant to Larry Joe Walker on September 1, 1963. West Virginia substantive law applies. Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

This policy was in the basic amount of $3,000 on Larry Joe Walker, the insured; $1,080 term insurance on Patricia Walker, his wife; and $1,000 term insurance on each of their two children, Deborah J. Walker and William D. Walker, with a $50 monthly income benefit. The policy provided for an additional indemnity benefit in the event of the accidental death of the insured. The total amount in controversy, according to plaintiffs' complaint and defendant's petition for removal, is $11,856.00.

Larry and Patricia Walker were divorced on April 19, 1965, and on May 8, 1965, at approximately 1:30 A.M., Larry was found dead near the residence of his former wife and his death was determined to have resulted from a gunshot wound.

The relevant events preceding Larry's death relate back to October 21, 1964, the date Patricia separated from him. Shortly thereafter, she instituted divorce proceedings in the Wayne County Circuit Court. Pending disposition of the divorce suit, a temporary order was issued requiring the husband to leave the home which was located at 3222 Chase Street, Huntington, West Virginia. The relationship between Larry and Patricia subsequent to the institution of the divorce

proceedings and prior to his death may be summarized as follows: Larry frequently visited the house at 3222 Chase Street, sometimes simply prowling around the outside of the house, and on one such visit he struck his wife. Patricia had several warrants issued for his arrest, both for trespass and for assault, and she made numerous calls to the police requesting protection from Larry. Under the terms of the final divorce decree, Patricia was granted exclusive use of the premises of the jointly held residence during the infancy of the children.

On the night of May 8, 1965, at about 11:00 P.M., Patricia heard something on the front porch. A few minutes later she received a telephone call from Larry, who was attempting to disguise his voice, threatening to kill her and the children. He apparently was calling from near the home, for within a short period of time he returned to the home, unscrewed the spotlight in the rear of the house, then ran to his car which was parked across the street. Following this incident, Patricia telephoned the police. Two officers responded to the call, but they were unable to find anyone around the house and, as a consequence, they left shortly thereafter. Within minutes after the officers left, Patricia again heard someone prowling around the house. She could not see the prowler, but she did give a warning to the effect that she would get a gun if he didn't go away. This warning had no effect, for the prowler continued to move around the house and eventually came to the living room window where he began to cut through the screen. At this point Patricia picked up a gun and walked to the middle of the living room and stated, "Larry, please, if that is you, please go away. Please go away and let me alone." However, the prowler continued to cut the screen. Patricia then fired through the living room window. The police, called shortly after the shooting, found the body of Larry lying near the window through which the shot had been fired.

It is on the basis of these facts that we are called upon to determine whether or not the death of Larry Joe Walker was due to "accidental means" within the terms of the life insurance policy, the pertinent provisions of which are as follows:

"This Company will pay, subject to the provisions of this policy, an additional sum equal to:

The Basic Amount of Insurance on Insured shown on page 1, in the case of the Insured's death, and

the amount of Term Insurance on Insured Wife shown on page 1, in the case of the Insured Wife's death,

upon receipt of due proof that such death occurred as the result, directly and independently of all other causes, of bodily injury caused solely by external violent, and *accidental means.*" (Emphasis added)

That the death occurred as the direct and independent result of external and violent means is not at issue; but was it the result of "accidental means" as that term is used in the additional indemnity clause of the life insurance policy? The plaintiffs contend it was, while the defendant contends it was not.

█ █ It is, of course, a cardinal principle of insurance law that clauses in insurance contracts which are drawn by the insurer and not readily comprehensible by those who pay the premiums should be liberally construed for the benefit of the insured. Thompson v. State Automobile Mut. Ins. Co., 122 W.Va. 551, 11 S.E.2d 849 (1940). Equally true is the fact that the terms used in an accident insurance policy, or in an accidental death clause of a life insurance policy, should be construed in their "plain, ordinary, and popular sense, rather than in a philosophical or scientific sense." Mitchell v. Metropolitan Life Ins. Co., 124 W.Va. 20, 18 S.E.2d 803 (1942).

█ The words "accident" and "accidental" have not acquired a technical signification in law and are generally construed according to ordinary understanding and common usage generally. 29A Am.Jur. Insurance Section 1164 (1960). Thus, an accident is usually defined as

an "event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected." "Accident," as that term is used in insurance policies, is generally defined as an "event happening without any human agency, or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens." Sizemore v. National Casualty Co., 108 W.Va. 550, 151 S.E. 841 (1930).

The West Virginia Supreme Court of Appeals has adopted the rule, recognized in Landress v. Phoenix Mutual Insurance Company, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934, that a distinction must be made between "accidental means" and an "accidental result," and that their determination must be made on the basis of foreseeability of the natural consequences viewed from the demeanor of the deceased (the insured) rather than from that of the person causing the death. Thus, all surrounding acts or conduct of the insured reasonably foreseeable by him as likely to result in his death must be taken as the controlling factors in determining whether or not it was by "accidental means." In other words, before a recovery is authorized, one must find in the circumstances leading to Larry Joe Walker's death a lack of probable cause for him to have apprehended it.

In *Sizemore,* supra, where the assured, the driver of a rapidly moving automobile, left the same to prevent the escape of a prisoner who had just jumped therefrom, and was killed, it was held that though the result (the driver's death) was "accidental," his act of leaping was intentional and, therefore, not accidental. The principle is stated in Pt. 2 of the Syllabus as follows:

"When injury or death follows or results from a voluntary act of the insured, and the act is one which is manifestly dangerous, and one which is not ordinarily done or performed without serious consequences to the doer, such result is not caused by 'accidental means.' "

In the later case of Beckley Nat. Exchange Bank, Admr. v. Provident Life & Accident Ins. Co., 121 W.Va. 152, 2 S.E. 2d 256 (1939), the insured-husband was shot and fatally wounded by his wife while committing an assault upon her. Recovery was sought under an insurance policy in effect on his life which provided for double indemnity if "death was caused by external, violent and accidental means." Here, again, it was the insured's own intentional conduct, in which he voluntarily engaged, that led to his death and it was, therefore, not by "accidental means." In denying recovery, the Court reasoned,

"When one, committing a humiliating and brutal assault upon another, is killed, the killing is a natural sequence and not an accident."

The Virginia Supreme Court of Appeals cited the Beckley Nat. Exchange Bank case with approval in Smith v. Combined Insurance Company, 202 Va. 758, 120 S.E.2d 267 (1961), and again in Wooden v. John Hancock Mutual Insurance Company, 205 Va. 750, 139 S.E.2d 801 (1965).

In the *Wooden* case, the insured came to his death by gunshot following a domestic quarrel under circumstances somewhat similar to those of the instant case. The Court denied recovery under an accidental death policy on his life because it found that he (the insured) was the aggressor in an argument which precipitated a struggle for the gun and which ended in his death and that, under such circumstances, he "did not die as a result of 'accidental means' within the accidental indemnity provision of the insurance contract."

Cited also in the *Wooden* case is the Missouri case of Perringer v. Metropolitan Life Insurance Company, 241 Mo. App. 521, 244 S.W.2d 607, where recovery on an insurance policy was denied because the insured's death resulted from his being shot in a scuffle, the Court saying,

"It surely must have been within his (the insured's) reasonable anticipation and foresight to assume that she would resist as much as possible. If in the scuffle to protect herself, he was killed, though not with intentional discharge of the revolver, his death was not caused by 'accidental means' within the provisions of the policy and there can be no recovery."

In the earlier case of Tabor v. Commercial Casualty Ins. Company of Newark, N. J., 104 W.Va. 162, 139 S.E. 656, 57 A.L.R. 968 (1927), the policy provided benefits for death by "external, violent and accidental means." The insured was shot and killed while approaching his slayer in an offensive and threatening manner. The Court allowed recovery on the theory that the insured had no reason to suspect that he would be assaulted with a deadly weapon, and it stated that the test to be applied was: "Did the insured appreciate that, by doing the act, he was putting his life and limb in hazard?"

Applying this test to the facts and circumstances of the instant case, viz.: The acts of the insured in prowling around the house in the dark of night and attempting a forceful entry in the face of a warning from his ex-wife that she would get a gun if he didn't leave, when viewed in the context of their past difficulties, distinguishes this case from the *Tabor* case, and impels the conclusion, which we now reach, that the insured voluntarily exposed himself to a known hazard, the probable consequences of which were reasonably foreseeable, and his resultant death was for this reason not fortuitous.

■ We, therefore, find from the stipulation and record before us that the death of Larry Joe Walker was not due to unforeseeable circumstances or by "accidental means," within the meaning of that phrase of the insurance policy involved, but rather was the "natural sequence" to a course of conduct on his part, preconceived and readily foreseeable as likely to produce just such a result.

In view of this disposition of the case, it is not necessary for us to pass upon the remaining issues raised by the parties which relate to the exclusionary clause with respect to the commission of an assault by the insured and the question of public policy as a bar to recovery on a life insurance policy where the insured's death occurs while engaged in the commission of a criminal act.

The defendant has accordingly discharged its obligation to the plaintiffs by paying the basic amount due under the life insurance policy issued to Larry Joe Walker and the plaintiffs' complaint will, therefore, be dismissed.