## Richmond

### LUCILLE BYRD

v.

### THE LIFE INSURANCE COMPANY OF VIRGINIA

March 2, 1979.

Record No. 770926.

Present: I'Anson, C.J., Harrison, Cochran, Harman, Poff and Compton, JJ.

Robert W. Mann *(Young, Kiser, Haskins, Mann & Gregory, Ltd.,* on briefs), for plaintiff in error.

William F. Stone, Jr. *(Stone, Joyce, Worthy & Stone,* on brief), for defendant in error.

I'ANSON, C.J., delivered the opinion of the Court.

Plaintiff, Lucille Byrd, instituted this action against defendant, The Life Insurance Company of Virginia, to recover double indemnity under the accidental death provision of a group life policy issued by the defendant to the Board of Trustees of the Virginia Supplemental Retirement System. Gordon L. Byrd was an insured under the policy and plaintiff was the beneficiary. Plaintiff alleged that her husband, Gordon L. Byrd, died as a result of bodily injuries incurred solely through violent, external and accidental means.

The case was tried to a jury and at the conclusion of all the evidence, both parties moved for summary judgment. The trial

court overruled plaintiff's motion, sustained defendant's motion, and entered summary judgment for the defendant.

The question presented is: Did the trial court err in striking the evidence and entering summary judgment for the defendant, or should the court have submitted the case to the jury? Hence, it is necessary that the facts be stated in considerable detail.

The parties entered into the following stipulation: "It is stipulated and agreed that on February 15, 1976, the named insured, Gordon Leon Byrd, sustained bodily injuries to the head, solely from a gunshot wound in the mouth, and that he died as a direct and sole result of such bodily injury, independently and exclusive of all other physical causes."

The evidence shows that Leonard G. Nelson fired the shots that resulted in insured's death. Nelson had lived with Lucille Stanley, although they were not legally married, for five or six years, but they had ceased living together approximately a year before the incident resulting in the shooting death of insured. The insured, who had been a friend of Nelson, started seeing Stanley on a nightly basis in January, 1976 when he became estranged from his wife.

Stanley's testimony shows that soon after the relationship between her and insured developed, insured complained that Nelson had been making telephone calls in an attempt to have him fired from his job. On the Friday evening preceding the Sunday, February 15 shooting, she heard insured and Nelson arguing over the telephone after which insured purchased a gun and told her that he was going to Nelson's trailer home. She dissuaded him from going, and he thanked her the next morning.

On the night of the shooting, Stanley met insured around 6:00 p.m. when he "got off" from work. When insured entered her car he was upset about the telephone calls, and said that he was going to put a stop to them. Before proceeding to Stanley's home, they went to a restaurant and insured had several beers. Later that evening, Stanley and insured went to a truck stop where he had five or six more beers. As they departed the truck stop around 11:00 o'clock, insured drove in an erratic manner and almost struck several vehicles head on. Stanley offered to drive, and insured became very angry. As they approached the turn-off to Nelson's home, insured suddenly swerved the car onto the driveway leading to Nelson's stating that he was going to "get a drink." Stanley said that she pleaded with insured not to go to Nelson's

home fearing that Nelson would kill him out of jealousy. Insured replied, "[i]f Buster [Nelson] kills me, Turkey [insured's brother] will kill him."

Stanley said that she had warned insured on several occasions that Nelson usually carried a gun "and not to fool with him," and that "people knew he was [a] violent" person. She also said insured knew what type of person Nelson was, knew he carried a gun, and that he was present on one occasion when Nelson pulled a gun on one of his friends.

When insured entered Nelson's home, he turned around and motioned for Stanley to come inside. Upon entering, Stanley sat down and insured, who had gone into the bathroom, returned with a .45 calibre pistol in his hand. Insured proceeded into the kitchen where he laid the gun on the sink while taking a drink with Nelson. Thereafter, Nelson and insured commenced arguing about the telephone calls, with Nelson denying ever making them. As the two returned to the living room area and were seated, Stanley sensed trouble brewing, so she attempted to exit the trailer but Nelson grabbed her by the arm telling her she wasn't "going nowhere." Insured interjected "[t]ake your damn hands off her." Nelson grabbed a nearby shotgun, pointed it at the insured, and stated, "I'd just as soon kill you as I had to look at you." Whereupon insured reached for the shotgun and the two men wrestled for control of it as Stanley fled the scene and jumped into her automobile.

Insured called Stanley back into the trailer, and as she reentered the trailer, she saw insured with his .45 pistol in one hand and a shotgun in the other. He laid the .45 down on the coffee table and proceeded to unload the shotgun as well as another one that was nearby. She said insured then told Nelson, "we're leaving now, and if you start shooting, I'm gonna come back."

Stanley again exited the trailer leaving insured there holding his gun on Nelson who was seated in a chair. While she waited in the car, she heard a commotion. As Stanley looked back toward the trailer, she saw Nelson come to the trailer door and heard him say he "needed some air" to which insured said, "Oh, it ain't a damn thing wrong with you." By now, Stanley had the car running and the lights on waiting to leave. When Nelson turned around, Stanley heard two shots. Nelson called to her, saying, "Get in here . . . I killed him. He come up here to kill me, and I killed him." When Stanley reentered the trailer, insured was on the floor with his gun at his feet.

Nelson's testimony shows the following: He was in bed when a car drove up the driveway to his home between 11:00 and 12:00 p.m. He got up, put his pants on, and placed a gun in his pants pocket. Finding insured near the door, Nelson invited him to come in and have a drink. As soon as insured entered the trailer, he kicked Nelson in the stomach, knocked him down in the chair, pulled his gun out and began cursing Nelson for talking about him. About that time Stanley walked in. Nelson got up and reached for his shotgun, but insured kicked it out of his hand. Insured grabbed another one of Nelson's shotguns and unloaded both of them. In the meantime, Stanley ran out of the house, started the motor of her car, and waited for insured while he was holding his gun on Nelson. Nelson said when insured looked out the trailer door, he (Nelson) pulled his gun out and shot insured.

In *Matney* v. *Cedar Land Farms*, 216 Va. 932, 933-34, 224 S.E.2d 162, 163 (1976), we said that in reviewing a case in which the trial court has sustained a motion to strike after the introduction of all the evidence, we apply the principles governing consideration of evidence upon a motion to set aside a verdict as contrary to the evidence. "'[W]e examine the evidence to determine whether or not a verdict in behalf of the losing party can be sustained. That is, upon a careful consideration of all the evidence, if we are of the opinion that reasonable men may differ on the conclusion to be reached, then it is our duty to hold that the trial court committed error in striking the evidence.' [Citation omitted]. In viewing the evidence we give the plaintiffs 'the benefit of all substantial conflict in the evidence, and all fair inferences that may be drawn therefrom.'" (Citations omitted).

When a life policy provides for double indemnity for loss of life through accidental means "it is generally held that if the insured voluntarily provokes or is the aggressor in an encounter, and knows, or under the circumstances should reasonably anticipate, that he will be in danger of death or great bodily harm as the natural or probable consequence of his act or course of action, his death or injury is not caused by an accident within the meaning of such a policy." *Wooden* v. *John Hancock Mutual*, 205 Va. 750, 755, 139 S.E.2d 801, 805 (1965); *Smith* v. *Insurance Company*, 202 Va. 758, 761, 120 S.E.2d 267, 269 (1961). *See also Isoard* v. *Mutual Life Ins. Co.*, 22 F.2d 956 (8th Cir. 1927); *Falster* v. *Travelers Insurance Company*, 216 Tenn. 137, 390 S.W.2d 673 (1965); Annot., 49 A.L.R.3d 673, 692, 693 (1973).

It is true that there was some conflict in Stanley's and

Nelson's testimony as to exactly what happened after the insured entered Nelson's home. However, the conflict was insufficient to present a factual question for the jury to determine whether insured's death was caused by accidental means in light of the undisputed evidence regarding the insured's course of action and conduct. Reasonable men could not differ that insured should have reasonably anticipated or foreseen death or some great bodily injury as a result of the voluntary and intentional confrontation.

The undisputed evidence shows that the insured was upset over Nelson's telephone calls which were prompted by his relationship with Stanley and he vowed to put a stop to them. Insured purchased a gun after the two men had argued over the telephone the Friday night before the fatal shooting. He was aware of Nelson's reputation for violence and had been warned by Stanley that Nelson usually carried a gun and would kill insured out of jealousy if he confronted him. Notwithstanding insured's awareness of these facts, he voluntarily went to Nelson's home, armed with a pistol and displayed it soon after entering the trailer. If the insured did not carry the pistol for the purpose of defending himself from an attack by Nelson, then he took it for use as an offensive weapon against Nelson. Surely, he saw or should have anticipated gunplay as a possible incident to the confrontation. Even though Stanley stated that insured told Nelson after he unloaded the two shotguns that they were leaving, it is uncontradicted that insured remained in the trailer and continued to threaten Nelson with his gun while Stanley was in her automobile blowing the horn for the insured "to come on." Thus, insured did not withdraw from the fray which he initiated; rather he remained and continued the confrontation until he was intentionally shot by Nelson.

As we view the evidence in this case, a jury verdict for the plaintiff could not be sustained. Reasonable men could not disagree that insured undertook a voluntary and intentional course of action and conduct from which as a reasonable man he should have anticipated or foreseen that he would be in danger of death or serious bodily injury. Thus, insured's death was not accidental within the meaning of the double indemnity provisions of the policy.

For the reasons stated, the judgment is

*Affirmed.*