## Richmond

MARILYN TUCKER

V.

LIFE INSURANCE COMPANY OF VIRGINIA

Record No. 812208.

September 7, 1984.

Present: Carrico, C.J., Cochran, Poff, Compton, Russell, and Thomas, JJ., and Gordon, Retired Justice.

*Dabney L. Pasco (Kostel, Watson, Snyder & Pasco*, on brief), for appellant.

*William T. Wilson (D. Thomas Blair; William T. Wilson & Associates*, on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Marilyn Tucker (hereafter, Marilyn), plaintiff, initiated this action in the trial court against The Life Insurance Company of Virginia, defendant, seeking to recover accidental-death benefits under a group life insurance policy that the Company issued as insurer. Everette M. Tucker, the decedent, was an insured under the policy and Marilyn, his wife, was his beneficiary.

In a jury trial, after plaintiff had completed the presentation of her evidence, defendant moved to strike the evidence. The trial court, ruling that the evidence showed as a matter of law that the insured's death was not accidental within the meaning of the policy, granted the motion and entered summary judgment for defendant. On appeal, Marilyn contends that the court erred in not submitting the question to the jury. In accordance with familiar principles, we will consider the evidence in the light most favorable to her.

It is uncontradicted that Tucker was fatally shot on November 23, 1979 by his son, Everett L. Tucker (hereafter, Everett). Three

witnesses, the medical examiner, Everett, and Marilyn, testified for the plaintiff.

The medical examiner testified that Tucker died after being struck in the left chest by eight buckshot pellets which penetrated his lungs and his heart. The witness estimated that the pellets entered Tucker's body in a three-and-one-half inch pattern at an angle of approximately 45 degrees, indicating that they were fired from a position in front of and to the decedent's left. He also estimated that the pellets were fired from a distance of three to six yards.

Everett was 15 at the time of the shooting. He was six feet two inches tall and weighed 180 pounds at the time of trial. His older sister, Clara, 17 at the time of trial, was married to Jimmy Walton. Everett also had two younger brothers, James and Matthew, and a younger sister, Susan. Matthew, the youngest of the five children, was 10 at the time of trial. Tucker was six feet one or two, weighed about 245 pounds, and was muscular. The Tucker residence was situated on a knoll or embankment. Concrete steps and a walk led from the house to a driveway below, which was parallel to the public road.

Everett recounted in detail the events leading to the shooting of his father. After hunting all day, Everett returned home about six p.m. In a few minutes, his brother, James, and his brother-in-law, Jimmy Walton, came in. Shortly thereafter, Tucker returned from work in his truck, entered the house, and began to drink beer. Everett and Walton went to milk the cow. When they returned, Marilyn drove into the driveway with Clara Walton, Clara's baby, Matthew, and Susan in the car. The family did not like to be around Tucker when he was drinking alcoholic beverages, so all but Tucker got in the car to leave the premises, but the car stalled.

In the meantime, Tucker had walked from the driveway to the bridge at the public road where he picked up a large rock which he held over his head. When Tucker saw that Marilyn's car would not start, he threw down the rock and approached the car. Marilyn had told everyone to get out and run. All did so, James and Matthew running through a field toward the mountain. Walton left the car to walk to his mother's house, but he did not answer when Tucker asked him where he was going. Enraged, Tucker grabbed Walton and began to hit him in the face with his fists. Walton fell down; Tucker "got down on him," and Everett saw his

father strike Walton four or five times. At this time, it was beginning to get dark. Walton had his father's unloaded 12-gauge shotgun in his hand, but he dropped it when Tucker attacked him; Clara retrieved the gun. She tried without success to persuade Tucker to stop beating her husband.

Everett, who had run to a position in front of the house on the embankment above the driveway, went in the front door and returned with his 12-gauge pump action shotgun. He testified that he intended to "shoot in the air or something," to break up the fight. Standing on the embankment facing the driveway, with the steps and walk leading from the house on his left, Everett loaded his gun with one shell. By this time, Tucker, who had pulled Walton up, was hitting him in the face while holding him by the shirt. Everett, then about 15 feet from Tucker, called to his father to stop. Tucker turned, saw the firearm in Everett's hand, and said if Everett did not use the gun he would use it. Without looking again at Everett, Tucker released Walton and began to walk at an angle toward the steps leading from the driveway to the house. Everett estimated that he would have been three or four yards from his father if Tucker had climbed the steps to the level on which he stood. Everett did not know what his father was going to do, but he was afraid Tucker would take the gun from him and hit him with it. Everett testified that without aiming he fired the gun at the ground in front of Tucker. He insisted that he did not intend to hit his father. Indeed, he said he did not know he had shot Tucker and at first thought his father was "just acting."

Everett testified that two or three weeks before the fatal shooting, his father, who had been drinking, had struck him. Everett said that he just "had to take it" because he had no intention of fighting his father. Knowing that Tucker was mean and unpredictable when he was under the influence of alcohol, Everett said he did not talk back to him on such occasions but tried to stay out of his way.

Marilyn's testimony was consistent with that of Everett. When she arrived in the car, she saw that Tucker was drinking. When he drank, Tucker "got a little mean at times," and she and the children "always tried to avoid him and just stay away . . . and then the next day we usually came when he was sober." On this occasion, therefore, they got in the car to leave. When the car would not start, Marilyn "told all the kids to get out and run," and they did so. She also ran. When she turned around, she saw her hus-

band beating Walton. She and the children called to Tucker to stop but he would not listen. Clara, who had picked up the unloaded shotgun that Walton was carrying, asked Tucker to leave her husband alone. Tucker, with Walton lying in the driveway, then ran after Clara but did not catch her. Returning to Walton, who was still on the ground, Tucker resumed his attack on his son-in-law. The next thing Marilyn remembered, Everett was standing with a gun, telling his father to leave Walton alone.

According to Marilyn, Tucker looked at Everett and started toward the steps and "that's when Everett shot down. He didn't pick the gun up and aim it or anything, he just shot it, and we didn't realize that he [Tucker] was shot at the time." When the gun was discharged, Marilyn was on the embankment at the house probably five yards farther from Tucker than was Everett. She heard her husband make the statement to Everett that if Everett did not use the gun he would use it, but she said that Tucker frequently made threats that he never carried out. She said that Tucker had never before faced resistance from any members of the family and that Everett had never before displayed a gun when his father was involved in a fight or beating. Marilyn also testified that she and the children were afraid to go to Tucker immediately after the shooting because they thought he might be "acting." When she saw that he was not getting up, she found enough "courage" to approach her husband to determine whether he had been shot. She believed that Walton was still on the ground after the shooting.

We have set forth the applicable law in determining whether a death comes within the coverage of accidental-death insurance as follows:

> The principle is thus stated in *Scarborough* v. *World Insurance Co.*, 244 N.C. 502, 94 S.E.2d 558, 561:
>
>> Where the policy insures against loss of life through accidental means, the principle seems generally upheld that if the death of the insured, although in a sense unforeseen and unexpected, results directly from the insured's voluntary act and aggressive misconduct, or where the insured culpably provokes the act which causes the injury and death, it is not death by accidental means, even though the result may be such as to

constitute an accidental injury. 45 C.J.S., Insurance, § 753, p. 779.

In accord with this principle it is generally held that if the insured voluntarily provokes or is the aggressor in an encounter, and knows, or under the circumstances should reasonably anticipate, that he will be in danger of death or great bodily harm as the natural or probable consequence of his act or course of action, his death or injury is not caused by an accident within the meaning of such a policy.

As we said in *Mutual Benefit Health & Accident Ass'n* v. *Ryder*, 166 Va. 446, 450, 185 S.E. 894, 896, "One who assaults another, or voluntarily enters into an affray and is hurt, has not suffered an accident."

*Smith* v. *Insurance Company*, 202 Va. 758, 761, 120 S.E.2d 267, 269 (1961).

The principle approved in *Smith* has been followed in *Wooden* v. *John Hancock Mutual*, 205 Va. 750, 755, 139 S.E.2d 801, 805 (1965), *Byrd* v. *Life Ins. Co. of Va.*, 219 Va. 824, 828, 252 S.E.2d 307, 309-10 (1979), and *Harris* v. *Bankers Life*, 222 Va. 45, 47, 278 S.E.2d 809, 810 (1981).

The facts in these four cases are enlightening. In *Smith*, the insured was a fugitive from justice who barricaded himself in a barn and shot at police officers who surrounded the building. When the barn caught fire from tear gas canisters used by the police, the insured was fatally burned. A verdict for the plaintiff, who claimed under an accidental-death policy, was set aside by the trial court, which entered judgment for the insurer. We affirmed, holding that the insured's death was not accidental within the meaning of the policy. 202 Va. at 762, 120 S.E.2d at 269.

The insured in *Wooden* went to the house of his ex-wife and started an argument during which she asked for past-due support money for their afflicted child. The insured reached for a firearm belonging to the ex-wife; she reached for it to keep him from hurting anybody. In the struggle for the weapon it went off, killing the insured. The trial judge, sitting as a fact-finder, ruled that the death was not accidental. In affirming, we held the evidence was sufficient to show that the insured was the aggressor. 205 Va. at 754, 139 S.E.2d at 804.

In *Byrd*, the insured, accompanied by his girlfriend, Stanley, went to the trailer home of Nelson, with whom Stanley previously had lived for five or six years. Although he knew that Nelson was violent and carried a gun, the insured complained that Nelson had made telephone calls in an attempt to have him fired from his job. Nelson denied making the calls. In Nelson's trailer, the insured displayed a .45-caliber pistol and wrestled with Nelson for control of a shotgun that Nelson pointed at him. The insured laid down the pistol, unloaded two of Nelson's shotguns, and told Nelson that he and Stanley were leaving but that if Nelson started shooting he would come back. Stanley went outdoors, leaving the insured holding a gun on Nelson; she started the car and waited for the insured to join her. Nelson came to the door, turned around, and shot the insured.

At the conclusion of the presentation of all the evidence, the trial court entered summary judgment for the insurer. We affirmed, holding that the insured undertook a voluntary and intentional course of action from which he reasonably should have anticipated danger of death or serious bodily injury, and that he did not withdraw from the altercation he initiated. His death, therefore, was not accidental. 219 Va. at 829, 252 S.E.2d at 310.

We held in *Harris*, however, that the evidence presented a jury issue. In that case, the insured had been living for several years with Parker and her two children. After having some alcoholic drinks while visiting a friend, the insured and Parker had an argument on their way home. Although Parker entered the house and told her children not to let the insured in, he got in and began to discipline one of the children, a girl, for failing to admit him. Parker, hearing the child scream, came downstairs and saw the insured hitting the girl. Parker intervened; the insured pushed her out of the way but did not resume hitting the girl. Parker seized a knife hanging on the wall and fatally stabbed the insured.

At the conclusion of the plaintiff's evidence, the trial court struck the evidence and ruled as a matter of law that the death was not accidental. On appeal, we reversed and remanded for a new trial, holding that it was a jury issue whether the insured should reasonably have anticipated that disciplining the child or pushing Parker would lead to a violent reaction. 222 Va. at 48, 278 S.E.2d at 810-11. In distinguishing *Smith* and *Byrd*, we observed that in those cases the insureds were armed with deadly

weapons and should have foreseen that their threats might result in reaction with deadly force. *Id.*, 278 S.E.2d at 810.

■ Marilyn relies on *Harris*. Pointing out that Tucker was not armed, she argues that a jury reasonably could find that he had broken off his attack on Walton, was heeding Everett's warning, and should not have been expected to anticipate that he would be shot, intentionally or unintentionally, by his son. We disagree.

The evidence shows that Tucker was a sadistic bully who, on the evening he was shot, terrorized his entire family. Knowing that he was mean and unpredictable because he was under the influence of intoxicants, they unsuccessfully attempted to escape by car. They then attempted with some success to escape on foot. Two children ran through a field, while Marilyn and Everett fled to high ground at the house; Walton, however, was attacked as he passed Tucker on the way to his mother's home. Tucker proceeded to administer a beating to Walton severe enough to leave him lying helpless in the driveway. There is no evidence that Walton struck back or even attempted to ward off Tucker's blows. Tucker knocked him to the ground, jumped on him, and left him only long enough to chase his daughter, Clara, who had the temerity to try to persuade him to desist. When Clara escaped, Tucker returned to his attack on her husband, ignoring the entreaties of the family.

It was only when Everett, who had never before confronted his father, armed himself with his shotgun and warned Tucker to discontinue his beating of Walton, that Tucker broke off that attack. As he left Walton lying on the ground once more, Tucker dared Everett to shoot by threatening to use the shotgun if Everett did not, and he began to move toward the steps. There was no period of reflection or meditation. Tucker released Walton, threatened Everett, and moved in the direction of the house in one continuous course of conduct.

Marilyn says that reasonable men could find that Tucker had heeded his son's warning, had ceased his misconduct, and was turning away to retreat from a dangerous situation. This is sheer speculation, unsupported by the evidence. Although, as Marilyn says, the jury reasonably could believe her testimony and that of Everett, neither of them thought Tucker was retreating to the house. It is true that Tucker did not climb directly up the bank to the level on which Everett stood; rather, he moved at a 45-degree angle toward the steps that rose to that level. But Everett, after

hearing his father's threat, thought he was coming up to take the gun and perhaps hit him with it.

Everett's uncontradicted testimony shows that he found it necessary to stop his father by shooting into the ground in front of him. Marilyn, on the same level as Everett, testified that Everett fired down the slope without aiming his gun. She thought Tucker was still dangerous when he moved toward the steps. The same terror that put the family members to flight at Tucker's first erratic approach froze them momentarily where they stood after he was shot. They were afraid to go to Tucker because they were not sure he had been shot. Everett and Marilyn thought he might be "acting," from which the plain inference follows that they feared that if he were not immobilized he would attack another victim.

Tucker voluntarily initiated the violent course of conduct that ended in his death. When he saw for the first time that his oldest son found his actions so dangerous as to require armed intervention, he should have anticipated that failure to cease all aggressive movements would cause him serious bodily harm. Instead of terminating his alcohol-induced aggression and making his termination known to his family, he uttered a menacing threat to Everett and began what Everett obviously believed was a belligerent move against him. The evidence leaves no doubt as to the family reaction. Their actions make it clear that they did not think Tucker had been pacified or that he had done anything but transfer his bellicose attention from an already prostrate victim to a prospective fresh victim.

Under the evidence in this case, we hold that the trial court did not err in ruling as a matter of law that Tucker's death was not accidental within the meaning of the insurance policy. Accordingly, we will affirm the judgment of the trial court.

*Affirmed.*

GORDON, R.J., dissenting.

The jury, had the case been submitted, could have properly found these facts:

The Insured irresponsibly provoked a fight with his son-in-law and battered the son-in-law. The Insured's son, armed with a gun, told his father to stop the battery.

The son had never before confronted his father. The Insured looked at his son and made a remark, the meaning of which is not clear: "you better use that or I will."

The Insured then quit the fight and walked toward the front door of his house, neither advancing toward nor looking at his son. The son, standing at an elevated position and with the gun at his waist, fired the gun at the ground. The shot, fired accidently, hit and killed the Insured.

From facts the jury could have properly concluded it was not foreseeable that the son would shoot the Insured while he was retreating. Because, in my opinion, the jury should have determined the issue, I would reverse the judgment and remand the case for a new trial.

*Harris* v. *Bankers Life*, 222 Va. 45, 278 S.E.2d 809 (1981), supports my conclusion. Indeed, it was more foreseeable in *Harris* that a mother would stab a person who was physically abusing her child, than here that a docile son would shoot a father who was retreating.