INTERNATIONAL UNDERWRITERS, INC., Plaintiff,

v.

The HOME INSURANCE COMPANY, Defendant.

Suzanne L. MONTGOMERY, Administratrix of the Estate of H. Eugene Montgomery, Plaintiff,

v.

The HOME INSURANCE COMPANY, Defendant.

Civ. A. Nos. 80-0489-A, 80-0490-A.

United States District Court, E. D. Virginia, Alexandria Division.

Oct. 23, 1980.

Wyatt B. Durrette, Jr., Fairfax, Va., for plaintiffs.

C. Torrence Armstrong, Alexandria, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

OREN R. LEWIS, Senior District Judge.

These consolidated suits were brought by the above-named beneficiaries to collect the accidental death benefits under two insurance policies issued by The Home Insurance Company.

The insured died while performing an autoerotic act.

The defendant denied liability and moved for summary judgment, relying on *Runge v. Metropolitan Life Ins. Co.*, 537 F.2d 1157 (4th Cir. 1976).

Perceiving a conflict in the evidence as to the cause of death, the Court allowed the parties time to complete their discovery, and set the matter for hearing on the merits.

Instead of calling live witnesses, the plaintiff, by agreement with counsel for the defendant, filed written statements from:

the decedent's wife—two Fairfax County emergency medical technicians—three Fairfax County police officers—three close friends and neighbors—the doctor who performed the autopsy—an article entitled, "Autoerotic Asphyxial Death", a medical/legal analysis of 43 cases—a certificate of analysis from the Bureau of Forensic Sciences—30 photographs of the scene surrounding the insured's death—the death certificate, and the reports and resumes of two expert witnesses.

The defendant offered no counter-statements or exhibits.

From the record thus made, the Court finds:

That the insured was a happily married man with two children, with another soon expected;

He was quite excited about the prospective birth of his third child and was

working in the room in which he died, fixing it up to be the nursery;

His finances were in better shape than they had ever been;

He had recently gotten involved in blacksmithing and had established a blacksmiths' guild, and had purchased a number of antique blacksmithing tools;

He was interested in, and considered an expert, as regards pulleys, ropes and knots, and had an extensive lock collection, including leg irons and handcuffs;

He left no notes nor memoranda of any kind indicating suicide.

On the morning of his death, his wife had taken the children to attend church and to work in the nursery—and then to do some shopping.

When she left home around ten o'clock, a. m., her husband was dressed and eating breakfast—he indicated he was going to be working on the upstairs bedroom that he was converting into a nursery.

When she returned home some three hours later, she went upstairs to the nursery and found her husband just hanging there. The Fairfax authorities were called.

They observed an elaborate pulley apparatus mounted on two exposed beams in the ceiling.

When nothing could be done to revive the insured, the emergency medical technicians left.

The room in question was apparently being rebuilt—there was no ceiling in the room so that several roof beams and rafters were exposed.

There was a pulley transfixed by an axle attached to the top of one such exposed ceiling beam. The pulley consisted of a clothesline rope inside the wheel portion and a nylon rope attached to the axles by a six—inch piece of strap. The nylon rope had a noose attached to its end which could be raised by pulling the clothesline rope attached to the pulley which, in turn, rotated the axle. The axle was 85 inches from the floor. There was a notch cut into the beam in which the axle was resting.

The insured's trousers were in a position somewhat below his hips and his undershorts were on—there were wet stains on his undershorts and on his legs.

The police took a series of photographs of the insured's body and of the room in which he was found—these photographs accurately portrayed the scene as found by the police upon their arrival.

In describing an autoerotic asphyxial death, Doctor James C. Beyer, who performed the autopsy, stated:

What happens when an accident occurs is that something goes wrong in the suspension system. The person may be on a chair or a ladder and they fall with their full body into the suspension system and they hang themselves. They frequently use a pulley—type system which becomes jammed and the same result ensues. The idea of the pulley system is that one uses two ropes; the first rope is attached to the neck and the second controls the pulley system itself. By pulling on the one rope, pressure is increased on the second rope. In addition, this system has a "fail safe" mechanism; i. e. as one pulls himself up, he may reach a point where he loses consciousness which, in turn, causes him to release his hold on the control rope, thereby permitting his body to fall to the floor.

As regards the insured, Doctor Beyer's findings disclosed that his death was caused by asphyxiation, secondary to accidental hanging.

Doctor Beyer testified that in his professional opinion, the insured's death was a result of this autoerotic practice. His conclusion was based principally on the following facts:

The existence of this pulley system which permitted regulation of pressure on the neck.

There was no known use for this pulley system in the room in which it was found.

When the insured was found, the pulley system was jammed.

In order to commit suicide by hanging, you have to have some means of maintaining constant steady pressure on the

neck. You cannot do that by holding something in your hand.

The insured's clothing was found in such a manner so as to suggest masturbation.

The deceased was found with a hangman's type noose. People engaging in this type of deviant sexual practice often do not use just a simple device but rather go in for something which, in their mind, has some significance. The use of the hangman–type noose is not too uncommon.

There was no apparent motive for suicide.

A ladder was found nearby the body and the body was found with the toes barely touching the ground.

The experts called by the plaintiff stated:

The complexity of the apparatus to alter the physiological state can be viewed as an indicator of prior autoerotic practice.

In this case, rather than just using a rope, the insured used a sophisticated pulley system as part of his autoerotic ritual.

On prior occasions he was apparently able to engage in this activity without serious consequences; but, on this occasion, the victim may have failed to take into account his recent and significant 40–pound weight loss in judging his response to the effect of the apparatus on him. In other words, he may have lost consciousness more rapidly on previous experiences, and this unanticipated turn of events proved fatal.

The experts found the circumstances surrounding the insured's death to be far more consistent with accidental asphyxiation associated with autoerotic hanging than with any alternative expectation, such as suicide, homicide, or death by natural causes.

The preponderance of the evidence indicated, in their opinion, that the insured died an unnatural and unintentional death.

The Court concludes from the evidence that the insured's death was caused by the malfunctioning of the pulley system while performing an autoerotic act resulting in death by asphyxiation.

The pulley system in this case was designed to allow the pressure on the neck to be regulated–had not the pulley system jammed, the insured's hand–hold on the control rope would have collapsed, dropping him to the floor.

The insurance policy in this case covered "loss from injury."

"Injury," as defined in the policy, means accidental bodily injury sustained by the covered person, * * * which results directly and independently of all other causes, in a loss arising out of the hazard defined in the description of hazards.

"Loss of life" is one of the losses provided for in the policy.

Having found that the insured's death was the accidental result of his autoerotic activities on the day in question, the insurance carrier must honor its coverage against "accidental death," and

IT IS SO ORDERED.

The defendant's reliance on *Runge, supra,* is misplaced–the insurance policy in *Runge* covered injuries sustained solely through violent external and accidental means.

The insurance policy in this case is an accidental–result policy.

Virginia has long recognized the difference between accidental means and accidental–result policies. See *Newsoms v. Com. Casualty Ins.,* 147 Va. 471, 137 S.E. 456 (1927).

The Court, in *Runge,* relied heavily upon two Virginia cases. *Smith v. Combined Insurance Company of America,* 202 Va. 758, 120 S.E.2d 267 (1961), and *Wooden v. John Hancock Mutual Life Ins. Co.,* 205 Va. 750, 139 S.E.2d 801 (1965), wherein the Virginia Supreme Court held:

In this case [Smith], the court concluded, the insured had voluntarily put himself in a position where he knew, or should have known, that death or serious bodily injury would be the probable consequence of his acts.

In such a situation, death was not effected by an accident within the meaning of the policy.

In *Wooden*, the Virginia Supreme Court noted:

Death or injury does not result from accident or accidental means within the terms of an accident policy where it is the natural result of the insured's voluntary act, unaccompanied by anything unforeseen, except the death or injury.

The facts in *Runge* are materially different from the facts in this case:

The decedent [Runge] had tied the electrical cord in such a fashion that when hanging from it, the balls of his feet would rest on the floor and by standing on his toes he would be able to vary the pressure on his neck. The decedent placed the noose formed in the electrical cord around his neck and stepped from the chair or stool to the floor, and then proceeded to masturbate. At the time he reached orgasm the asphyxia was accentuated to the degree that the decedent lost consciousness, his body relaxed, and he hanged to death.

The Court held that death under these circumstances was a natural and foreseeable, though unintended, consequence of Runge's activity.

In contrast, the insured's pulley system in this case was designed to preclude the risk of death—should unconsciousness approach, the fail-safe feature was designed to release the pressure on his neck and drop him to the floor.

Under these conditions, death was neither intended, natural nor foreseeable.

Autoerotic acts, such as this, are not uncommon in this day and age—death seldom occurs—unless one is fully aware of all the circumstances associated with the death scene, and the attendant ropes, belts and other physical paraphernalia are thoroughly examined, the true nature of the case may be missed. Therefore, it is extremely important that the forensic pathologist completely comprehend and properly diagnose these tragic cases and label them correctly insofar as cause and manner of death are concerned.

In this case, the examining pathologist has so done and has concluded that the cause of death was accidental—the defendant insurance carrier offered no evidence to the contrary.

Finally, the defendant contends, its insurance policy expressly excludes coverage for any death "caused by, contributed to or resulting from * * * intentional self—inflicted injuries."

They argue that the placing of a hangman's noose around one's neck and strangulation to the point of partial asphyxia was certainly an intentionally self—inflicted injury which caused, contributed to, or resulted in the insured's death.

The fallacy of this argument is that it is not supported by the uncontradicted evidence in this case. The insurance company conceded that the insured's death was not intentional—and there was no evidence of strangulation:

"Injury" resulting in the insured's death, as defined in the policy, was not the voluntary placing of the hangman's noose around the insured's neck nor the self—inflicted partial asphyxia—neither of which caused harm or death—the "injury" was the loss of consciousness caused by the malfunction of the pulley system.

Insurance policies under Virginia law are to be construed according to their terms, and the plain meaning of such terms must be given effect. See *Aetna Insurance Co. v. Kaplan*, 206 Va. 1, 141 S.E.2d 725 (1965)—thus, where the policy is susceptible to two constructions—one which would effectuate coverage and the other would not, it is the Court's duty to adopt that construction which would effectuate coverage. See *White v. Blue Cross*, 215 Va. 601, 212 S.E.2d 64 (1975).

Had the insurance carrier in this case intended to exclude coverage for accidental death resulting from voluntary autoerotic acts, it could and should have plainly so stated.

It has not so done, and judgment will be entered for the plaintiff in both cases.

An appropriate judgment order should be prepared by counsel for the plaintiff, submitted to counsel for the defendant for approval as to form, and then to the undersigned for entry.