ALLSTATE INSURANCE COMPANY

V.

WILLIAM H. PATTERSON, SR., ADMINISTRATOR OF THE
ESTATE OF WILLIAM H. PATTERSON, JR., DECEASED

Record No. 830058

June 13, 1986

Present: Carrico, C.J., Cochran, Compton, Stephenson, Russell, and Thomas, JJ., and
Gordon, Retired Justice

*John G. Crandley (Preston, Wilson & Crandley*, on brief), for appellant.

*C. Richard Cranwell (Cranwell, Flora and Moore, P.C.*, on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

This is an appeal in a declaratory judgment proceeding brought by Allstate Insurance Company (Allstate) for a determination whether William H. Patterson, Jr. (Patterson), was an insured under the terms of the uninsured motorist provisions of an automobile liability policy Allstate had issued to Patterson's father. Allstate sought the determination because Patterson had claimed the benefit of the uninsured motorist coverage for personal injuries he suffered on April 15, 1979, when his motorcycle was struck by an automobile operated by an uninsured motorist.

The uninsured motorist provisions of Allstate's policy defined the term "insured" to include "the named insured and, while residents of the same household, the spouse and relatives of either." The central question in the trial below was whether Patterson was a resident of the same household as his father, the named insured. This question was submitted to a jury by way of an interrogatory requiring a special verdict. The jury answered the question affirmatively. The trial court denied Allstate's motion to set aside the verdict and, in a final order, declared that Patterson was an insured under Allstate's policy.

After the case reached this Court, Patterson died, and we substituted the administrator of his estate in his place as the appellee (hereinafter, Patterson's administrator). We are not informed of the cause of Patterson's death.

Allstate has assigned a number of errors. In the view we take of the case, however, one question is dispositive: Did the trial court err in refusing to hold as a matter of law that Patterson was not a resident of his father's household on the date of the accident?

The record shows that Patterson was 26 years old at the time of the accident. He lived with his parents in the family home in Salem, Virginia, until 1971, when he married and moved into an apartment with his wife. Approximately two years later, the marriage ended in divorce, and Patterson returned to his parents' home. In 1973, he moved to an apartment complex owned by his father at Cloverdale, Virginia, where he worked as a maintenance man. In 1976, the father sold the apartment complex, and Patterson again returned to his parents' home.

On each of these occasions, Patterson took with him all his personal belongings when he moved from his parents' home, and he changed his mailing address and the address on his driver's license and motor vehicle registration. Then, each time he returned to his parents' home, he brought with him all his personal belongings, and he changed his mailing address and the address on his operator's license and registration card. On each return, he occupied the same room he used as a boy, and he resumed the chores he always performed while living with his parents.

In 1976, Patterson became a member and officer of a motorcycle group known as the "Renegades," which maintained clubhouses throughout Virginia and in other states. He was "on the road traveling a lot" from clubhouse to clubhouse during 1976 and 1977. In the fall of 1976, he "started staying at a cabin" on Bent Mountain, near Salem, which was "another Renegades clubhouse," and he shared living quarters there with Virginia Hinchey. He also stayed with Virginia Hinchey at the apartments of friends in Roanoke. He held his last fulltime job in Roanoke "[s]ometime in 1977 or '78."

The Renegades maintained a clubhouse at 108 Louisa Avenue in Virginia Beach. In 1978, Patterson began spending more time in Virginia Beach searching for employment. He used the clubhouse, which consisted of four bedrooms and a bar, for lodging, and he gave the clubhouse address on job applications. Virginia Hinchey moved to Virginia Beach in 1978 and secured employment. She and Patterson shared living quarters at the clubhouse and also at an apartment in the Windsor Woods section of Virginia Beach.

When Patterson left his parents' home on trips for the Renegades, he took with him only a bedroll and "two or three changes of clothes," leaving the remainder of his personal belongings behind. He returned to his parents' home "when [he] wasn't staying at one of the clubhouses or visiting around." Each time he returned, he occupied the bedroom he used as a child, and his mother laundered his clothes and prepared his meals. He did not pay board or otherwise contribute toward household expenses. He did perform the chores he was customarily assigned when at his parents' home.

In addition to maintaining his parents' address with the Division of Motor Vehicles, Patterson used that address in connection with his banking activities. He gave the same address while in the emergency room at Bayside Hospital in Virginia Beach following the accident in question.* He later gave the hospital the address of the Renegades' clubhouse in Virginia Beach because he "would be staying around the Beach for several months for physical therapy."

While on the witness stand, Patterson admitted that "based on [his] own estimate," he had stayed at his parents' home approximately 10% of the time in the period between early 1976 and the date of the accident in 1979. He insisted, however, that his "father's home . . . was [his] home."

■ As noted previously, Allstate's policy defined the term "insured" to include "the named insured and, while residents of the same household, the spouse and relatives of either." We considered similar policy language in *State Farm Mutual v. Smith*, 206 Va. 280, 142 S.E.2d 562 (1965). There, we said:

> The meaning of "resident" or "residence", a prolific source of litigation, depends upon the context in which it is used. . . . Here, we must interpret the meaning of "resident", when followed by "of the same household". The word "household", . . . connotes a settled status; a more settled or permanent status is indicated by "resident of the same household" than would be indicated by "resident of the same house or apartment".

*Virginia Hinchey was also injured in the accident in question. Her case was the subject of an earlier appeal involving different issues. *Hinchey* v. *Ogden*, 226 Va. 234, 307 S.E.2d 891 (1983).

*Id.* at 285, 142 S.E.2d at 565-66. We also said:

"Whether the term 'household' or 'family' is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a 'collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness'."

*Id.* at 285 n.6, 142 S.E.2d at 565-66 n.6 (quoting *Lumbermens Mut. Casualty Co.* v. *Pulsifer*, 41 F. Supp. 249, 251 (D. Me. 1941)).

We also dealt with similar policy language in *St. Paul Ins.* v. *Nationwide Ins.*, 209 Va. 18, 161 S.E.2d 694 (1968). There, we quoted only a portion of the *State Farm* definition of the term "household," *viz.*, " 'a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof.' " *Id.* at 22, 161 S.E.2d at 697.

Patterson's administrator says that our use in *St. Paul* of only a portion of the *State Farm* definition "reflects the most current thinking of the Virginia Supreme Court," suggesting that we intended in *St. Paul* to abandon the unquoted portion of the *State Farm* definition. We disagree.

In *St. Paul*, we quoted only a portion of the *State Farm* definition because use of that portion effectively disposed of the question involved in the case. We intended neither to abandon the remainder of the definition nor to approve the use of a bobtailed version in a jury instruction, as occurred here. Accordingly, we reaffirm the *State Farm* definition in full.

In any event, Patterson's administrator maintains that Patterson qualified as a resident of his father's household even under the full *State Farm* definition. Patterson's intent with respect to membership in the family group was important, it is argued, and his conduct reflected his intent. This conduct included "using the Salem address on his Virginia drivers license; using the Salem address with his banking institution; giving the Salem address in the Emergency Room at Bayside Hospital; keeping all but a few changes of clothes and all of his personal effects in his room in Salem; and performing certain chores as a part of his family obligation in Salem." (Appendix references omitted.)

■ We agree with Patterson's administrator that a person's intent is important in determining whether he qualifies as a resident of a particular household. We also agree with a statement Patterson's administrator quotes from a Utah case, where the court said that "[r]esidence emphasizes membership in a group rather than an attachment to a building." *American States Ins. Co., Western Pac. Div.* v. *Walker*, 26 Utah 2d 161, 164, 486 P.2d 1042, 1044 (1971). Even so, we do not believe the evidence supports the conclusion that Patterson was a resident of his father's household at the time of the accident on April 15, 1979.

■ The *State Farm* definition speaks plainly in terms of a "settled or permanent status" as necessary to a finding that a person is a resident of the household of the named insured. The definition also speaks of a household as a "unit of permanent and domestic character." This definitional language imports the necessity of regularity as the basis of a person's status vis-a-vis the household of the named insured. Hence, while a person's intention to become a member of a particular household need not be coupled with continuous residence, the intention must be accompanied by a reasonable degree of regularity in the person's residential contacts with the household; casual, erratic contacts are not sufficient.

Patterson's own words and conduct bespeak the casual, erratic nature of his residential contacts with his father's household and belie his professed intent to make that household his own. Patterson testified that he stayed at his parents' home only "when [he] wasn't staying at one of the [Renegades'] clubhouses or visiting around," and he estimated that he spent only about 10% of his time at his parents' home after early 1976. From the time Patterson became a member of the Renegades until the moment of the accident, he led an existence best described as nomadic, with no regular place of residence, either at his parents' home or elsewhere.

■ In our opinion, whether Patterson qualified as a resident of his father's household was a question upon which reasonable persons should not differ, given the facts and circumstances of this case. Hence, the trial court should not have submitted the question to the jury but should have decided as a matter of law that Patterson was not a resident of his father's household on the date of the accident. *See Byrd* v. *Life Ins. Co. of Va.*, 219 Va. 824, 828, 252 S.E.2d 307, 309 (1979); *Insurance Company* v. *Gourdine*, 205 Va. 57, 62, 135 S.E.2d 120, 124 (1964).

Accordingly, we will reverse the judgment of the trial court and enter final judgment here declaring that Patterson was not an insured under the uninsured motorist provisions of Allstate's policy.

*Reversed and final judgment.*