## CIRCUIT COURT OF THE CITY OF RICHMOND

Nationwide Mutual Ins. Co.

v.

William G. Robinson, III, and
Derrick Antoine Lewis

April 4, 1995

Case No. HE-563-4

BY JUDGE RANDALL G. JOHNSON

This is a declaratory judgment action in which Nationwide Mutual Insurance Company seeks a ruling that its automobile policy issued to William G. Robinson, Jr., and Elnora J. Robinson does not provide coverage for Mr. Robinson's son, William G. Robinson, III, ("William") in William's personal injury claim arising out of an accident which occurred on November 19, 1993. At issue is whether William was a member of his father's household on the date of the accident.[1]

The relevant facts are not in dispute. On November 19, 1993, William was a passenger in a car driven by Derrick Antoine Lewis. Allegedly due to Lewis' negligence, the car went off the right side of the highway and struck a tree. William, who was sixteen years old at the time, has now filed suit by his father and next friend against Lewis for his injuries, and he has served Nationwide as an uninsured motorist carrier under a policy issued to Mr. Robinson and Mr. Robinson's mother, Elnora J. Robinson, William's grandmother.

Mr. Robinson and William's mother, Wanda J. Robinson, whose last name "Robinson" is strictly a coincidence, have never been married. By order entered by the Juvenile and Domestic Relations District Court of the City of Richmond when William was about ten months old, however, William's parents were awarded joint custody of him. Such order was

---

[1] Although the pleadings identify William's father as "William G. Robinson," his name is actually William G. Robinson, *Jr.*

entered at the request of both parents, and it remains in effect today. Before the age of ten years, William lived with his mother and spent a substantial majority of his time with her. He did, however, spend "a lot" of time with his father, and was welcome in his father's house anytime. After age ten, William started spending more and more time with his father and, at the time of the accident, estimates that he lived in his mother's house 60% of the time, and in his father's house 40% of the time. In fact, as long as he told both parents where he was, he had complete freedom to stay in either parent's house at any time, although he usually spent school nights with his mother and weekends and holidays with his father. During the summer, he went "back and forth." William's Department of Motor Vehicles I.D. card lists his mother's address as his address.

With regard to the parents' houses, at the time of the accident they were twelve or thirteen blocks apart. William's mother has another son, not by Mr. Robinson, and each son had his own bedroom in their mother's house. William also had clothes, toys, video games, and other typical possessions there. He also, however, had his own bedroom at his father's house, and he also had clothes, toys, video games, and other typical possessions there. Also living in his father's house was Elnora J. Robinson, who was Mr. Robinson's mother and William's grandmother, and William's relationship with everyone in both households was great. As already noted, he had the complete run of both houses, and stayed in whichever one he chose at anytime at all.

The policy in question contains the following provision under its uninsured motorist coverage:

> II. Persons Insured
> Each of the following is an Insured under this insurance to the extent set forth below:
> (a) the Named Insured and, *while residents of the same household*, the spouse and relatives of either . . . .

Emphasis added.

From the evidence presented, this Court has absolutely no problem in concluding that at the time of the accident, William was a resident of his mother's household. This is true for the simple reason that whatever fact can be cited in support of arguing that William was a resident of his father's household, the same fact applies with at least equal force to saying he was a resident of his mother's household. William had a bedroom at his father's house; he had a bedroom at his mother's house. William had

clothes at his father's house; he had clothes at his mother's house. William had toys and games at his father's house; he had toys and games at his mother's house. Moreover, William spent more time at his mother's house than at his father's house, 60% to 40%. It would simply defy logic to say that he was a resident of his father's household to the exclusion of his mother's. It is William's argument, however, that a person is not limited to being a resident of only one household at any given time and that, under the particular facts of this case, William was a resident of his mother's household *and* his father's household. I agree.

The precise question presented here has not been decided by our Supreme Court. It has long been held, however, that a person may have several residences at the same time:

> A man may be a resident of a particular locality without having his domicile there. He can have but one domicile at one and the same time, at least for the same purpose, although he may have several residences.

*Long v. Ryan*, 71 Va. (30 Gratt.) 718, 720 (1878).

While the above principle has thus far been applied only to the question of residence in a *locality* — that is, a city, county, state, or country — I see no reason why it does not also apply to residency of a household. In *State Farm Mutual v. Smith*, 206 Va. 280, 142 S.E.2d 562 (1965), the Court gave the following definition of the term household:

> Whether the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a "collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness."

206 Va. at 285, n. 6 (*quoting Lumbermens Mut. Cas. Co. v. Pulsifer*, 41 F. Supp. 249 (D. Me. 1941)).

It is this Court's opinion that there is nothing in the above definition which precludes simultaneous residency in two households. Particularly here, where William's parents had legal joint custody of him, William's relationships with the other members of his family in both houses very definitely made him a member of each household. Each house contained a "collective body of persons living together within one curtilage, subsisting

in common and directing their attention to a common object, the promotion of their mutual interests and social happiness." Indeed, just as the Court noted earlier that there is no fact which supports a finding that William was a resident of his father's household that does not also support a finding that he was a resident of his mother's household, the antithesis is also true with the exception of the amount of time spent at each house and the use of his mother's address on his I.D. card; that is, there is no fact which supports a finding that William was a resident of his mother's household that does not also support a finding that he was a resident of his father's household. The Court rejects Nationwide's argument that spending 60% of his time at his mother's house, as opposed to 40% at his father's, and the resulting use of his mother's address on his I.D. card preclude William from being a resident of his father's household. If residency were determined only by the amount of time spent in a given place, the principle that a person can have several residences at the same time would mean absolutely nothing unless a person spent precisely the same amount of time in each place claimed as a residence. I do not believe that to be true.

The Court also rejects Nationwide's argument that the use of the terms "*single* group," "*one* head," "*one* roof," "*one* curtilage," and "*common* object" (emphasis added) in *State Farm Mutual v. Smith, supra,* precludes the result now reached. There is nothing mutually exclusive about the use of those terms in *Smith* and dual residency here. Each household in this case *was* a single group; each *had* one head; each *was* under one roof and within one curtilage; and each *did* subsist in common and direct their attention to a common object: the promotion of their mutual interests and social happiness. William just happened to be a member of each group. The Court can think of no reason why the principle which allows a person to be a resident of two or more localities, each of which, to paraphrase *Smith,* is a collection of persons, as a single group, with one governing body, living in the same geographic area, a unit of permanent character, under one government; a collective body of persons living together within one border, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness, does not apply with equal force to allow a person to be a resident of more than one household. I hold that it does.

The Court has also reviewed the cases cited by Nationwide. They do not support Nationwide's position. In *State Farm Mutual v. Smith, supra,* the plaintiff, Elaine R. Mellow, was injured while driving an automobile

owned by her sister's husband, Francis J. Frost. At the time of the accident, Mellow, whose husband had recently died, was living with her sister and brother-in-law in Norfolk, Mellow having come to Norfolk approximately two months earlier with the intention of staying with her sister until her, Mellow's, baby was born, the baby being due about five months after Mellow arrived in Norfolk. Mellow brought her two infant sons with her, as well as her family's clothing, but she did not bring any furniture, furnishings, or appliances. About two months after the accident and still before the baby was born, Mellow left Norfolk and went to live with her mother-in-law in California. In holding that Mellow was not a resident of her sister's household, which in that case meant that she *was* covered by insurance, the Court stated:

> The meaning of "resident" or "residence," a prolific source of litigation, depends upon the context in which it is used. Here, we must interpret the meaning of "resident," when followed by "of the same household." The word "household," which has been defined as set forth in the footnote, connotes a settled status; a more settled or permanent status is indicated by "resident of the same household" than would be indicated by "resident of the same house or apartment." We interpret the language of the policy as excluding coverage if Elaine R. Mellow had assumed a residence and become so intertwined with the Frost family as to become a member of that family, and as extending coverage if she was a visitor or sojourner in the Frost home.
>
> The proper conclusion to be drawn from the facts in this case is that Elaine R. Mellow was a visitor or sojourner in the Frost home and, therefore, was driving a "Non-Owned Automobile" at the time of the accident. She came to Norfolk for a limited period of time, limited to the remaining period of her pregnancy. Her original plan was altered by another invitation; she left the Frost home upon receiving an invitation to live with her mother-in-law. Had she originally intended to be, or subsequently become, a resident of the Frost household, it is unlikely she would have agreed to a change of her settled status upon receiving another invitation. (There is no evidence of a strained relationship between Elaine R. Mellow and Frost or his sister, resulting from the accident.) The evidence as a whole does not support a

finding that Elaine R. Mellow was a resident of the Frost household.

206 Va. 285-86 (footnotes omitted).

Unlike the situation in *Smith*, William G. Robinson, III, never intended to live in his father's house for a "limited period of time." He has lived in his father's house, and in his mother's house, from the time he was born. Indeed, the only alteration in his "original plan," if it can be called that, is that his living with his father *increased* after he was ten years of age, and he has never "forsaken" his father for another invitation. In other words, the "settled" status which the Court found lacking in *Smith* is unquestionably present here.

Similarly, in *St. Paul Ins. v. Nationwide Ins.*, 209 Va. 18, 161 S.E.2d 694 (1968), a car driven by Troy Leon Elkins, a serviceman on leave, was involved in an accident in which William R. Elkins, a passenger, was injured. At the time of his induction, Troy lived with his parents. While he was in the service, however, his parents separated, and they were living separate and apart at the time of the accident. After the accident, Troy's parents were divorced, and Troy, upon being discharged from the Army, lived with his mother until he was married approximately four months later. At issue was whether a policy of insurance issued to Troy's father, Tilden Elkins, and which covered relatives of Tilden's household, covered the accident. The Court held that it did not:

> In *State Farm Mut. Automobile Ins. Co. v. Smith*, 206 Va. 280, 285, 142 S.E.2d 562, 565, 566 (1965), we adopted one of the recognized definitions of the word "household," as used in such insuring provisions, as meaning "a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof." See also, 41 C.J.S., *Household*, p. 367. The evidence in the present case fails to show that at the time of the accident Tilden Elkins, the named insured, was maintaining such a household and that Troy was a resident thereof. On the contrary, the undisputed evidence is that at the time Troy's parents were separated and the former household had been broken up by the father's desertion. Moreover, in his testimony, Troy repeatedly speaks of his living "at home with my mother" after the separation, which refutes the claim that he was at that time a member of his father's household.

209 Va. at 22. Those facts are not at all similar to the ones presented here.

In *Allstate Ins. Co. v. Patterson*, 231 Va. 358, 344 S.E.2d 890 (1986), William H. Patterson was injured when his motorcycle was struck by an automobile operated by an uninsured motorist. He claimed coverage under his father's policy. At the time of the accident, Patterson was twenty-six. He had lived with his parents until he was eighteen when he married and moved into an apartment with his wife. Approximately two years later, he and his wife were divorced, and he moved back in with his parents. Very soon thereafter he moved to an apartment complex owned by his father, where he worked as a maintenance man. When his father sold the complex three years later, he returned to live with his parents. Later that same year, he became a member of a motorcycle group known as the "Renegades," which maintained clubhouses throughout Virginia and in other states. From the time he joined the Renegades until the accident, he was "on the road traveling a lot" from clubhouse to clubhouse, and spent more and more time away from his parent's house, mostly with a female friend at one of the clubhouses or an apartment. He did, however, leave most of his personal belongings at his parents' house, and returned there "when [he] wasn't staying at one of the clubhouses or visiting around." He maintained his parents' address with the Division (now Department) of Motor Vehicles, and used that address for banking purposes. He testified that for the two or three year period before the accident, he stayed at his parents' house approximately 10% of the time. The Court held that he was not a resident of his father's household:

> [W]e do not believe the evidence supports the conclusion that Patterson was a resident of his father's household at the time of the accident on April 15, 1979.
>
> The *State Farm Mutual v. Smith, supra*, definition speaks plainly in terms of a "settled or permanent status" as necessary to a finding that a person is a resident of the household of the named insured. The definition also speaks of a household as a "unit of permanent and domestic character." This definitional language imports the necessity of regularity as the basis of a person's status vis-a-vis the household of the named insured. Hence, while a person's intention to become a member of a particular household need not be coupled with continuous residence, the intention must be accompanied by a reasonable degree of regularity in the person's residential contacts with the household; casual, erratic contacts are not sufficient.

> Patterson's own words and conduct bespeak the casual, erratic nature of his residential contacts with his father's household and belie his professed intent to make that household his own. Patterson testified that he stayed at his parents' home only "when [he] wasn't staying at one of the [Renegades'] clubhouses or visiting around," and he estimated that he spent only about 10% of his time at his parents' home after early 1976. From the time Patterson became a member of the Renegades until the moment of the accident, he led an existence best described as nomadic, with no regular place of residence, either at his parents' home or elsewhere.

231 Va. at 363.

In the case at bar, William's existence, though split between his parents' two houses, cannot be described as "nomadic." While he more or less stayed where he chose, it was always with one of his parents, not with a motorcycle "group." Moreover, the Court believes that there is a substantial difference between the residential "intent" of a person in his early to mid-twenties and that of a minor. Indeed, far from trying to get away from his parents to be with a wife, a girlfriend, or a motorcycle "group," William's purpose was to be with his parents. And since he could not be with both of them at the same time, he did the next best thing; he shared time with both. That was not the situation in *Patterson.*

In *Government Employees Ins. v. Allstate,* 235 Va. 542, 369 S.E.2d 181 (1988), Lloyd L. Menscer was awarded a judgment of $50,000 against Teresa L. Nighohossian for personal injuries he sustained as a result of Nighohossian's negligent operation of a car owned by James R. Luther. Allstate contended that Luther's automobile was covered under a policy issued by GEICO to Luther's wife, Wilhemina E. Luther, from whom Mr. Luther was estranged. In fact, James Luther and Wilhemina Luther had separated three and one-half months prior to the accident, and he had only returned to the marital home once during that time. While Ms. Luther entertained "some hope," at least "in [her] mind," of a reconciliation, she and her husband never discussed it. After the accident, she decided that "the marriage was essentially lost," and a divorce was subsequently entered based on the original date of separation. In holding that Mr. Luther was not a resident of Ms. Luther's household on the date of the accident, the Court said:

> At the time of the accident, James had not resided in Wilhemina's household for approximately four months. James had removed virtually all his belongings from the marital home and, so far as the record discloses, had returned to the home on only one brief occasion. More important, nothing in the record suggests that James ever intended to reconcile and resume cohabitation with Wilhemina. "[A] person's intent is important in determining whether he qualifies as a resident of a particular household." *Patterson*, 231 Va. 363, 344 S.E.2d at 893.
>
> Based upon the undisputed evidence, the only reasonable inference to be drawn is that James was not a resident of Wilhemina's household at the time of the accident.

235 Va. at 548-49. Again, the situation is vastly different here.

The situation in the present case is also vastly different from the one presented in *Furrow v. State Farm Mutual Auto Ins.*, 237 Va. 77, 37 S.E.2d 738 (1989). There, Donna Elizabeth Price, age twenty-two, was fatally injured in an automobile accident. Her administrator made a claim on her mother's policy, alleging that decedent was a resident of her mother's household. The facts, however, showed otherwise. Specifically, the facts showed that when she was seventeen, decedent left her family's home in Ironto near Salem to live in Ironto with Albert W. Furrow. The couple, who never married, continued to live together during most of the remaining six years, during which time a daughter was born. At the end of six years, the relationship between the decedent and Furrow began to deteriorate. About the same time, she met Allen W. Hobbs, a coworker, and they began meeting secretly. About nine days before the accident, she left Furrow and went, with her child, to her mother's house. She brought only "a few clothes" of her own and "a few of the baby's things." She and her child shared a bedroom with her older sister. According to Hobbs, the decedent's stay at the mother's home "was a temporary arrangement; it wasn't permanent." In fact, according to Hobbs, he and decedent planned to be married. Decedent's mother testified that decedent did not want "to live nowhere in Ironto;" she just wanted "to get away." The trial court held that the decedent was not a resident of her mother's household, and the Supreme Court agreed:

> Manifestly, the evidence shows that the decedent never intended to become a member of the mother's "household." She did not plan to join the permanent, domestic, single group composed,

according to the evidence, of her mother, her older sister, her younger brother, and the mother's husband, living at the home in Ironto. Instead, the decedent was in transition from Furrow's residence to Hobbs' residence. One relationship had ended and another had begun. The decedent merely was staying temporarily with her mother while she was making the change. As her mother said, the decedent did not want to live in Ironto; she wanted "to get away."

237 Va. at 81.

Finally, *United States Fid. & Guar. Co. v. Hart*, Civil Action No. 92-0047-D (W.D. Va., decided July 19, 1993), not only does not support Nationwide's position, it actually helps William. In that case, Charlotte Hart's parents divorced in 1976 when Charlotte was eight years old. Under the terms of the separation agreement, custody of Charlotte was awarded to her mother, and Charlotte lived with her mother in North Carolina through the tenth grade. She spent approximately half her summers with her father in Virginia, but never any other time. Upon entering the eleventh grade, she transferred to a boarding school and upon graduation entered college, both in North Carolina. During this time, she lived at school for nine months a year, and spent breaks about "50/50" at each parent's home. However, she kept only a few belongings at her father's house and did not have a room there. Furthermore, she always used her mother's address for mailing purposes. The Court concluded:

> Charlotte appears to have been more of a visitor than a resident at her father's home both before and after going away to school and, therefore, at the time of the accident. A number of facts support that conclusion. There is no evidence that her father ever had legal custody of her after the divorce, notwithstanding his considerable financial support. Furthermore, Charlotte did not have her own room at her father's house and kept few possessions there. She never used her father's home as a mailing address — a fact that belies any purported intent to be a resident of that household. Indeed, when applying to colleges, filing income tax returns, and dealing with other such important matters, Charlotte always gave her mother's address and never indicated that she was a resident of Virginia. She likewise possessed a North Carolina driver's license rather than a Virginia driver's license. Accordingly, in light of all the evidence, the court finds that

> Charlotte was not a resident of her father's household at the time of the accident.

*Id.* at 4.

The above holding is significant for several reasons. First, the fact that the Court considered it important to its holding that Charlotte's father never had legal custody of her seems to imply that where legal custody exists, so too may residency. Here, William's parents had (and have) joint custody. Similarly, the Court's giving as a reason for its decision the fact that Charlotte did not have a room in her father's house likewise seems to imply that if she had had a room, the Court's decision might have been different. William had (and has) a room in his father's house. The same is true with regard to possessions. The Court in *Hart* noted that Charlotte "kept few possessions" at her father's house. Here, the evidence is that William's possessions were nearly equally divided between the two houses. Moreover, while this Court specifically does not rely on anything that happened *after* William's accident to determine residency at the time of the accident, there was evidence that William used his father's address as *his* mailing address after the accident so that he could continue to attend John Marshall High School after his mother had moved out of John Marshall's zone. This is different from the situation in *Hart*, where Charlotte *always* used her mother's address.[2] In other words, almost all of the facts relied on by the Court in *Hart* to hold that residency did not exist in the father's household are exactly opposite of the facts in the case at bar. If anything, *Hart* implicitly supports William's argument that he was a resident of his father's household here.

In summary, the Court finds that a person may be a resident of more than one household at the same time for purposes of the insurance policy provision at issue here. The Court further finds that based on the evidence presented, William was a resident of his father's household at the time of his accident. He is covered by Nationwide's policy.

---

[2] The Court is not sure that it is appropriate to rely on post-accident events to determine residency on the day of the accident. This particular post-accident event is mentioned, however, because the Supreme Court appears to have at least *considered* post-accident events in determining residency in *State Farm Mutual v. Smith, St. Paul Ins. v. Nationwide Ins.*, and *Government Employees Ins. v. Allstate*, all *supra.*