# CIRCUIT COURT OF FREDERICK COUNTY

State Farm Mutual
Automobile Ins. Co.

v.

Allstate Ins. Co. et al.

October 3, 1997

Case No. (Law) 96-222

BY JUDGE JOHN E. WETSEL, JR.

This declaratory judgment action came before the Court on October 2, 1997, for trial. This is a dispute among three insurance carriers as to their respective responsibilities under automobile liability policies. Thomas C. Palmer, Esquire, appeared for the Plaintiff; John W. Hartel, Esquire, appeared for the Defendant Allstate Insurance Co.; Albert M. Orgain, IV, and Raul Novo, Esquires, appeared for the Defendant Providian Insurance Co.; and J. Sloan Kuykendall, III, Esquire, appeared for the Defendant Rogers. The Defendant Lichliter, appeared in person without counsel. All of the parties' prefiled exhibits were admitted. Evidence was heard and argued by the parties.

At the trial, the court found that the Providian Policy was not void as claimed by Providian. Upon further consideration, the Court has made the following decision and determined that the Providian Policy does not provide liability coverage but that the Allstate policy does.

## I. *Findings of Fact*

The following facts have been admitted by the parties or found by the greater weight of the evidence.

### *Accident*

On November 29, 1995, Julie M. Rogers was operating an automobile on Aylor Road in Frederick County, Virginia. On that date, Rogers was involved in an automobile accident with a vehicle being operated in the opposite direction by Charles B. Lichliter, Jr.

As a result of that collision, Rogers suffered injuries and filed a personal injury action in the Circuit Court of the City of Winchester, and Rogers' uninsured motorist carrier, State Farm, filed this declaratory judgment action to determine whether Lichliter was insured under the Providian and Allstate policies at the time of the accident.

The vehicle being operated by Lichliter was a 1978 Ford pickup owned by Brian T. and Elizabeth M. Ganey.

The accident occurred at approximately 11:00 p.m. and was investigated by State Trooper Kendra of the Virginia State Police.

### *Insurance Policies*

The vehicle operated by Rogers was insured by State Farm Mutual Automobile Insurance Company Policy Number 6733 991-46. State Farm is Rogers' uninsured motorist carrier.

The 1978 Ford pickup owned by the Ganeys was insured by an automobile policy issued by Allstate Insurance Company to the Ganeys, which was in effect at the time of the accident. Allstate has denied coverage to Lichliter, alleging that Lichliter was not using the vehicle with the permission of the Ganeys at the time of the accident.

Providian Auto. and Home Insurance Company issued an automobile insurance policy to Doris M. Lichliter, who is Lichliter's mother, which was in effect at the time of the accident. Providian has denied coverage and claims that Lichliter was not a resident of his mother's household at the time of the accident, that on Mrs. Lichliter's initial application for insurance and later confirmation statement that Mrs. Lichliter did not disclose that Lichliter resided with her, if he in fact did, and that pickup trucks are not insured vehicles under the pertinent policy provisions of their policy.

The Providian Policy Part I, Coverage A, Providian Prefiled Exhibit 4, provided liability coverage "with respect to any non-owned automobile ... . [to] any relative, but only with respect to a private passenger automobile or trailer." The policy states that " 'relative' means a relative of the named insured, who is a resident of the same household." Doris Lichliter was the named insured, and Charles Lichliter was not a resident of her house in 1990, when she initially applied for the Providian Policy (Providian Prefiled Exhibit 1), nor was he a resident of her household when she filed the confirmation statement on February 28, 1992 (Providian Prefiled Exhibit 2), whereby Mrs. Lichliter updated her policy information.

### Lichliter's Residence

Charles Lichliter was born January 1, 1953. He is a convicted felon. His left leg is amputated below the knee, and his right foot is amputated. He is on social security disability, and he is an alcoholic. At the time of the accident his license was suspended and had been suspended since 1991. He was incarcerated from January 1992 until sometime in August 1994, when he was released from the penitentiary. Upon his release, he went to live at the Salvation Army facility in Winchester, and then he lived with a girlfriend for about four months. After that he lived with various friends from time to time for varying lengths of time incident to his peripatetic life style up until the time of the accident. In the approximate fifteen months from August 1994 until the accident on November 29, 1995, he had stayed with his mother approximately seven nights. Although Lichliter claimed to have stayed at his mother's approximately thirty days in that fifteen months and although he used his mother's residence as a mailing address, he did not live there on any consistent basis, nor did he keep any appreciable belongings at his mother's house. Lichliter was disabled, and his disability and SSI payments were mailed to 208 Opequon Avenue, Winchester, Virginia, because that was his mailbox, not his place of residence. Due to his wanderings, the only place that he could regularly stop by to check whether he had any mail and pick up his social security check was his mother's residence. Although his mother's house is within seventy feet of the Ganey residence, rather than sleep at her house, Lichliter slept in Ganey's pickup truck the night before the accident, which dramatically illustrates the character of his peripatetic, "street type" life.

The Accident Report prepared by Trooper Kendra, the Incident Report and the Supplementary Report prepared by Officer Andrews, and the records of the Winchester General District Court all indicate Lichliter's address as 208 Opequon Avenue, Winchester, Virginia.

### Permission to Drive Ganey Vehicle

Lichliter and Brian Ganey had spent the afternoon of November 29, 1995, together working on chain saws and drinking beer. Lichliter was unable to find his key to his mother's house and was looking for it during the evening. Mrs. Lichliter wanted her key back, because she did not want her son coming around her house when he was drinking.

The Ganey pickup truck could be operated without a key and could be started by using a screw driver. Lichliter was aware of this fact, because he had driven the pickup before.

Ganey dragged Lichliter out of his house on the evening of November 29, 1995, because Lichliter was intoxicated. Without Ganey's permission Lichliter took Ganey's pickup truck that night and drove it to Roger Hamilton's home in Middletown, Virginia, which is about twelve miles south of Winchester. Lichliter intended to spend the night at Hamilton's as he did on occasion.

Lichliter testified that he assumed that Brian Ganey knew that he was driving the Ganeys' pickup truck to Roger Hamilton's in Middletown.

When Lichliter arrived at Hamilton's, Roger Hamilton was asleep. James Yorgenson and his wife, Sheila, were also at the Hamilton residence.

At approximately 10:30 p.m., Brian Ganey was awakened by his wife, who had just returned from work, who inquired about the whereabouts of the pickup truck. Brian Ganey presumed that Lichliter had taken the vehicle and called Roger Hamilton's home.

There were several telephone calls made by Brian Ganey to the Hamilton home, during which Ganey said that he told Sheila Yorgenson, who Ganey characterized as "intoxicated and running off at the mouth," that "I want my 'MF-ing' truck back in fifteen minutes; if it's not here I'm going to notify the police." While there is some conflict about the number of calls and the persons to whom Ganey spoke, Ganey testified that he never specified who was to drive his truck back to Winchester nor did he expressly prohibit Lichliter from driving his truck back to Winchester.

At 12:22 a.m. on November 30, 1995, Brian Ganey reported that his vehicle was missing to the Winchester Police Department. The matter was investigated by Officer Andrews. Brian Ganey told Officer Andrews that he had called Lichliter at about 10:30 p.m. at a friend's home and, at that time, had told Lichliter that he needed to have his truck back home, so he could go to work.

It was not until approximately 1:37 a.m. on November 30, 1995, that Officer Andrews found out about the automobile accident involving Lichliter and Rogers, which took place at approximately 11:00 p.m. the evening before.

There are several routes from Middletown to Winchester, the most direct being via U. S. Route 11 or Interstate 81. The accident happened on Aylor Road near Stephens City, Virginia. Although Aylor Road is between Middletown and Winchester, it is off the beaten path insofar as the most direct routes between Middletown and Winchester are concerned, but it does provide a circuitous route to Winchester. The accident site is about one mile from I-81 and about one quarter of a mile in straight line distance from I-81. Lichliter said he was took Route 277 and was traveling north on Aylor Road at the time of the accident, which would be another route to Winchester, over less traveled roads than I-81 and Route 11, although other evidence indicates that he was traveling south on Aylor Road at the time of the accident. The area north of 277 and south of U. S. Route 522 contains a labyrinth of secondary roads and residential streets.

## II. *Conclusions of Law*

### A. *Omnibus Clause*

In *The Hartford Ins. Co. v. Davis*, 246 Va. 495, 498, 436 S.E.2d 429 (1993), the Supreme Court stated:

> Virginia Code § 38.2-2204, the omnibus-clause statute, requires that an automobile insurance policy provide coverage for a person who is "using" a motor vehicle "with the expressed or implied consent of the named insured." Implied permission may arise from a course of conduct between the parties. *Hartford Accident & Indem. Co. v. Peach*, 193 Va. at 266, 68 S.E.2d at 523. Further, the burden of proof is on the party seeking to bring himself within the omnibus-coverage clause of the policy. *Id.* at 264-65, 68 S.E.2d at 522.
>
> Since Code § 38.2-2204 is remedial, it must be interpreted liberally in construing clauses such as the one at issue here. *State Farm Mut. Auto. Ins. Co. v. Geico Indem. Co.*, 241 Va. 326, 329-30, 402 S.E.2d 21, 22 (1991). Nevertheless, this Court has rejected the expansive interpretation of courts in some other states that express permission to use a vehicle for one purpose implies permission for all other purposes. *Id.*; *State Farm Mut. Auto. Ins. Co. v. Cook*, 186 Va. 658, 665, 43 S.E.2d 863, 866 (1947).

In determining insurance coverage, and specifically applying the Omnibus Clause of the Code of Virginia, the public policy underlying the statute is to broaden the scope of coverage found in automobile liability policies to confer financial accountability for any driver, and thus the statute and policies issued thereunder will be construed liberally. *Emick v. Dairyland Ins. Co.*, 519 F.2d 1317 (4th Cir. 1975); *American Auto. Ins. Co. v. Fulcher*, 201 F.2d 751 (4th Cir. 1953); *State Farm Mut. Ins. Co. v. Cook*, 186 Va. 658, 43 S.E.2d 863 (1947); *City of Norfolk v. Ingram*, 235 Va. 433, 367 S.E.2d 725 (1988).

The Omnibus Statute is mandatory and, hence, every automobile liability insurance policy issued in Virginia will be construed to include the Omnibus Clause. *Grange Mut. Cas. Co. v. Criterion Ins. Co.*, 212 Va. 753, 188 S.E.2d 91 (1972); *Fidelity & Cas. Co. v. Harlow*, 191 Va. 64, 59 S.E.2d 872 (1950); *Newton v. Employers Liab. Assur. Corp.*, 107 F.2d 164 (4th Cir. 1939), *cert. denied* 309 U.S. 673 (1940).

The Allstate policy covering the Ganey vehicle is subject to the Omnibus Statute contained § 38.2-2204(A), Code of Virginia, 1950, as amended.

Express consent has been defined by Virginia courts as permission of an affirmative character, directly and distinctly stated. *Hinton v. Indem. Ins. Co.*, 175 Va. 205, 8 S.E.2d 279 (1940). There is a conflict in the evidence as to whether Ganey spoke directly to Lichliter after Lichliter had arrived at Hamilton's residence, but even if Ganey did not expressly give permission to Lichliter to drive his pickup back to Winchester, there is no question but that Ganey gave Lichliter his implied consent to drive the pickup back to Ganey's residence in Winchester.

"Our omnibus statute, Code § 38.2-2204(A) ... requires that insurance coverage extend to anyone 'using. . . the motor vehicle ... with the express or implied consent of the named insured against liability [for claims arising] as a result of negligence in the operation and use of such vehicle'." *City of Norfolk v. Ingram*, 235 Va. 433, 437, 367 S.E.2d 725 (1988). There is "[n]o reason not to apply the same rule of liability where, without express permission, there is a pattern of conduct from which permissive use may be implied. *See Snowhite v. State*, 243 Md. 291, 221 A.2d 342 (1966)." *Denby v. Davis*, 212 Va. 836, 838, 188 S.E.2d 226 (1972) (negligent entrustment).

There is an excellent overview of the law of implied consent in automobile liability insurance cases in *Provident Gen. Ins. Co. v. Murray*, 30 Va. Cir. 435, 436 (Richmond 1993):

The omnibus clause is to be construed liberally in favor of coverage. *State Farm Mut. Auto. Ins. Co. v. Cook*, 186 Va. 658, 43 S.E.2d 863

(1947). The concept of "implied consent" is even more liberally construed when there has been express consent for social as opposed to business purposes. *Liberty Mut. Ins. Co. v. Mueller*, 432 F. Supp. 325 (W.D. Va. 1977), *aff'd*, 570 F.2d 508 (4th Cir. 1978). The question of implied consent is to be determined by the trier of fact. *State Farm Mut. Auto. Ins. Co. v. Cook, supra.* The burden of proof of consent rests on one claiming the permission. *Liberty Mut. Ins. Co. v. Venable*, 194 Va. 357, 73 S.E.2d 366 (1952). Permission to use a vehicle is not permission to use it for all purposes, including the permittee's own personal use. *State Farm Mut. Auto. Ins. Co. v. Cook*, 186 Va. 658, 43 S.E.2d 863 (1947). The Supreme Court of Virginia has stated "that before the person using the automobile becomes an additional assured under the omnibus clause, permission must be expressly or impliedly given for that use." *Fidelity, etc., Co. v. Harlow*, 191 Va. 64, 59 S.E.2d 872 (1950).

"Under Virginia law, implied permission arises from either a course of conduct involving a mutual acquiescence in, or a lack of objection to, a continued use of the automobile, signifying consent." *Liberty Mutual Ins. Co. v. Mueller*, 432 F. Supp. 325, 328 (W.D. Va. 1977), *aff'd* 570 F.2d 508 (4th Cir. 1978). Factors to be considered by the Court in determining whether there is implied permission are the "practice of the parties over a sufficient period of time prior to the day on which the insured car was being used ... lack of objection to the use by the permittee ... [and] ... leaving the keys in or with a vehicle ... ." 7 Am. Jur. 2d, *Automobile Insurance*, § 252. *See also* 10B Michie's Jurisprudence, *Insurance*, § 150.

Although Mr. Ganey may not have given Lichliter his express permission to use his truck, Lichliter clearly had Ganey's implied permission to drive the pickup truck to Ganey's residence in Winchester. Implied permission arises from a course of conduct involving mutual acquiescence in, or a lack of objection to, a continued use of a vehicle signifying consent. *Hopson v. Shelby Mut. Cas. Co.*, 203 F.2d 434 (4th Cir. 1953); *State Farm Mut. Ins. Co. v. Cook, supra.*

Lichliter called the Hamilton residence, where he spoke to a person whom he did not know, and essentially told that person that if his pickup truck was not back in fifteen minutes, that he was going to call the police. Even by Ganey's account when he spoke to this person, he knew that Lichliter was at the Hamilton residence and that Lichliter had driven the Ganeys' truck to the Hamiltons. Clearly, Ganey's statement indicated that he wanted someone to drive his truck back to his house immediately. Ganey did not specify who was

to drive the truck, nor did he prohibit anyone from driving it. This general implied or express consent applied to Lichliter as well as to the other persons then present at the Hamilton residence.

Pursuant to Ganey's general directive, Lichliter was on his way from Middletown to Ganey's residence when he was involved in the accident. The fact that he did not chose the most direct route, or that he may have become confused in his travel, is not such a material deviation or departure from his grant of permission to return the truck to Ganey as would be necessary to vitiate the general grant of consent and instruction to return the truck to Winchester. *See City of Norfolk v. Ingram*, 235 Va. 433, 436-37, 367 S.E.2d 725 (1988); and *Aetna Ins. Co. v. Czoda*, 200 Va. 385, 105 S.E.2d 869 (1958).

## B. *Household Resident*

"The question as to who is a member of the insured's 'family' or 'household' within the coverage of an insurance policy depends largely upon the precise terminology of the particular policy involved and the particular circumstances present." 43 Am. Jur. 2d, *Insurance*, § 177. The Supreme Court recently considered this question in *USAA Cas. Ins. Co. v. Hensley*, 251 Va. 177, 182, 465 S.E.2d 177 (1996):

> We have considered similar policy language in a number of other cases. In doing so, we said:
> "The meaning of 'resident' or 'residence,' a prolific source of litigation, depends upon the context in which it is used ... . Here, we must interpret the meaning of 'resident' when followed by 'of the same household.' The word 'household' ... connotes a settled status; a more settled or permanent status is indicated by 'resident of the same household' than would be indicated by 'resident of the same house or apartment'."
> *Allstate Ins. Co. v. Patterson*, 231 Va. 358, 361, 344 S.E.2d 890, 892 (1986) (quoting *State Farm Mut. Auto. Ins. Co. v. Smith*, 206 Va. 280, 285, 142 S.E.2d 562, 565-66 (1965)). Continuing, we also said:
> "Whether the term 'household' or 'family' is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a 'collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social

happiness'." *Patterson*, 231 Va. at 362, 344 S.E.2d at 892 (quoting *Smith*, 206 Va. at 285, n. 6, 142 S.E.2d at 565-66, n. 6).

And, as we noted in *Patterson*, a person's intent is important in determining whether he qualifies as a resident of a household. 231 Va. at 363, 344 S.E.2d at 893.

Providian's policy is clear and unambiguous as to who is an insured under its liability provisions when it uses the language "a relative of the named insured who is a resident of the same household [the insured's]."

A temporary sojourn or visit by a relative does not make the relative a resident of the insured's household, because there is no melding of the family unit. *See State Farm Mutual v. Smith*, 206 Va. 280, 142 S.E.2d 562 (1965) (sister, who was pregnant, temporarily living with sister during her pregnancy was not a resident of the sister's household). *Allstate Ins. Co. v. Patterson*, 231 Va. 358, 344 S.E.2d 890 (1986), is on point, and in that case the Supreme Court determined as a matter of law that a son was not a member of his father's household given what was described as a nomadic lifestyle. The *Patterson* son returned to the family home only when he was not traveling or staying with friends or at clubhouses belonging to the motorcycle gang of which he was a member. While he maintained his parents' residence as his official mailing address, the *Patterson* son estimated that he stayed at his parents home about 10% of the time during the three years preceding the accident in question. This ten percent of the time is far more than the seven nights in fifteen months that Lichliter's mother testified that he stayed at her house in the time preceding the accident.

Charles Lichliter was not a resident of his mother's household at the time of the accident, so he is not an insured under the Providian Policy.

Charles Lichliter was using the Ganey pickup at the time of the accident with the permission of Ganey, so Lichliter is an insured under the Allstate policy issued to the Ganeys. Since that is the coverage on the vehicle involved in the accident, that would be the primary coverage.