# CIRCUIT COURT OF SPOTSYLVANIA COUNTY

Government Employees Ins. Co.

v.

Integon Indemnity Corp. et al.

December 18, 1997

Case No. CH96-385

BY JUDGE WILLIAM H. LEDBETTER, JR.

In this declaratory judgment action, the parties seek a determination of insurance coverage obligations for damage resulting from a motor vehicle accident. The threshold issue with respect to some of the policies in question is whether the operator of the vehicle was a permissive user. As for the other policies, the dispositive issue is whether the injured party was a member of the same household as the named insured on those policies.

### Facts

Donald T. Blevins (Blevins) sustained personal injuries when he was struck by a motor vehicle on May 21, 1995. The accident occurred in the parking lot outside The Elephant's Nest, a bar located in a strip shopping center in Spotsylvania County. The driver of the vehicle was Ricky Lee Eisler (Eisler).

Blevins sued Eisler for personal injuries resulting from the accident. That action is pending in this court. In that case, Blevins claims that he was struck by his own vehicle, negligently driven by Eisler, as he and several friends were leaving the bar.

Blevins' vehicle was insured by Integon Indemnity Corporation. Integon concedes its coverage as insurer of Blevins' vehicle.

Blevins resided at 11042 Ashby Drive in a house owned by his mother, Mary D. Honaker. At the time of the accident, he had lived there more than two years. He was an adult, a high school graduate, divorced, and employed as a construction worker. He owned a 1985 Chevrolet pickup insured by Integon. His mother owned a 1994 Buick insured by GEICO under a Florida policy. Because Honaker spent much of her time in Florida, the parties dispute whether she was a resident of the Ashby Drive house or a member of the same household as Blevins.

Blevins' brother, David Blevins, also divided his time between Florida and the Ashby Drive address. David owned a 1975 Dodge insured by GEICO. The parties dispute David's residence and whether he was a member of Blevins' household on Ashby Drive.

Eisler lived with his mother, Frances Spencer, on Robinson Lane in Falmouth. He was an adult, a high school graduate, and an employee of Pizza Hut. Two vehicles were registered in Spencer's name: a 1984 Chevrolet Caprice and a 1992 Ford Ranger. These vehicles were insured by GEICO. Eisler regularly drove the Ranger, considered it his, and made the payments on it.

The circumstances of the accident are as follows.

Blevins, Eisler, Anthony Stake (Stake), Brent Richard Schultz (Schultz), and Judy Minter, Schultz's girlfriend, gathered frequently on weekends to pitch horseshoes, drink beer, cook out, socialize, and watch NASCAR races. All of them gathered at Schultz's home on the afternoon of Saturday, May 20, 1995. That evening they went to The Elephant's Nest to watch an auto race on television. Blevins, Eisler, and Stake went in Blevins' pickup. Blevins drove. Minter drove her car. Schultz went separately in his vehicle.

At the bar, the group drank beer, snacked, watched the race, and socialized until the early morning hours of May 21st. Most of the time, they sat together at the same table — or two tables pulled together — but occasionally they mingled with the crowd or stood at the bar.

At some point, Minter, the only one not drinking alcohol that evening, said that she would drive everyone back to Schultz's house in her car. The group appeared to acquiesce. She collected Schultz's keys and asked Blevins for his keys. Blevins placed his keys on the bar in front of her. Minter then went to the restroom, assuming that everyone would pay his tab and be ready to go upon her return.

Then, for some reason no one can explain, Eisler, who had paid his tab, picked up Blevins' keys and headed for the door. According to Minter, who had just returned from the restroom, Stake said to Blevins, "Don, Rick just took the keys, it is time to go." According to Stake, it was Blevins who noticed that Eisler had taken the keys and said, "Come on, Rick's got the keys, let's go." In any event, they hurried to pay their tabs and leave.

Blevins and Stake left the bar and walked toward Blevins' pickup. Eisler, already in the truck, moved the truck forward out from its parking space, turned left toward the front entrance of the bar, and struck Blevins.

## Status of the Case

Blevins is the plaintiff in a personal injury action against Eisler pending in this court. GEICO has filed this separate declaratory judgment action seeking a determination of its indemnity obligations under the policies it issued to Spencer, Honaker, and Blevins' brother, in the event Blevins were to recover a judgment against Eisler.

The declaratory judgment action was set for trial on August 5, 1997. On that day, counsel for all parties agreed to submit the case to the court upon the depositions of Blevins, Blevins' brother, Honaker, Eisler, Stake, Schultz, and Minter; the insurance policies; the pleadings; and memoranda of law. Integon, conceding its coverage under the policy issued for Blevins' vehicle, did not participate further.[1] Counsel for GEICO and Blevins have now submitted memoranda.

## Was Eisler a Permissive User of Blevins' Vehicle?

GEICO contends that Eisler was not a permissive user of Blevins' vehicle so that its liability coverage under the policy issued to Eisler's mother, Spencer, is not available. No one disputes that Eisler was a resident of Spencer's household at the time of the incident.

Every automobile liability insurance policy sold in Virginia must contain an omnibus clause extending coverage to anyone operating the vehicle

---

[1] As Blevins explains in his memorandum, Integon's coverage is available to Blevins under any interpretation of the facts. If Eisler was operating Blevins' vehicle with permission, Integon's liability coverage is triggered. If Eisler was operating the vehicle without Blevins' permission, Eisler was an uninsured driver and Integon's uninsured motorist coverage for Blevins' vehicle applies.

with permission of the insured owner, express or implied. Virginia Code § 38.2-2204; *Lumbermen's Mut. Cas. Co. v. Indemnity Ins. Co.*, 186 Va. 204 (1947). The omnibus clause is remedial and must be liberally construed to subserve the public policy reflected in it, which is to broaden the coverage of automobile liability policies. *See* 10B M.J., *Insurance*, § 150.

The issue under the omnibus clause is not one of agency but one merely of permission. Permission may be either express or implied.

Express permission is defined as consent or permission of an affirmative character, directly and distinctly stated, outspoken, and not merely implied or left to inference. *Aetna Cas. and Sur. Co. v. Czoka*, 200 Va. 385 (1958).

Implied permission is not confined to affirmative action. It involves an inference arising from a course of conduct or relationship between the parties in which there is mutual acquiescence or lack of objection under circumstances signifying assent. *Hinton v. Indemnity Ins. Co.*, 175 Va. 205 (1940). Normally, it is a question of fact whether permission was given and, if given, whether it was withdrawn. *Virginia Farm Bureau Ins. v. APCO*, 228 Va. 72 (1984).

Here, there is no evidence of express permission. Blevins did not expressly authorize, consent to, or permit Eisler to operate his pickup, even to move it from its parking space to a position close to the bar door. Eisler acknowledges that he did not have express permission to drive the vehicle.

The real issue, then, is whether Eisler had implied permission to operate Blevins' pickup.

Permission cannot be implied from a course of conduct or relationship of these parties because Eisler had never driven Blevins' truck. Permission cannot be inferred from friendship alone. *Utica Mut. Ins. Co. v. Travelers Ins. Co.*, 335 F.2d 573 (4th Cir. 1964).

Blevins, who cannot recall the events because of a severe head injury, argues that permission can be inferred from the fact that he saw Eisler take the keys and did not protest or voice an objection. The weakness in that argument is its failure to take into account all of the surrounding circumstances. Blevins had put his keys on the bar in response to Minter's declaration that she would drive everyone home. Blevins put his keys on the bar for Minter. While Minter was out of the room, Eisler grabbed them without saying anything to anyone and headed for the door. Eisler explained his actions as follows:

> I don't think it was my intention to drive home, but I had just picked the keys up off the table and I was going out to get the ve-

hicle and I was going to meet them at the front door . . . . Like I said, it was getting late. It was getting time to go.

Admittedly, Blevins did not restrain Eisler or otherwise protest his sudden, unannounced behavior. Instead, Blevins exclaimed to Stake, "Come on, Rick's got the keys, let's go." However, it is an impermissible leap to conclude from that response that Blevins acquiesced in Eisler's use of his vehicle. From the evidence, one cannot even assume that Blevins thought that Eisler was going to drive his pickup. Under the circumstances, Blevins easily could have assumed that Eisler was going to Minter's vehicle, as Minter, Schultz, and Blevins had arranged, and Eisler had taken the keys so that they would not be left behind. Or, Blevins just as easily could have assumed that Eisler was going to Blevins' pickup to get into it for the ride home, not to drive it. In any event, Blevins' lack of protestation, under the circumstances of this case, does not signify assent to Eisler's use of his vehicle.

For these reasons, the court concludes that Eisler was not a permissive user of Blevins' vehicle at the time of the accident.

### Did Blevins Reside in the Same Household as His Mother?

At the time of the accident, Blevins lived at 11042 Ashby Drive in Spotsylvania County. He had lived there for a little more than two years.

The residence was owned by his mother, Mary D. Honaker. She and her husband, now deceased, purchased the house in 1972.

In the mid-1970's, Honaker and her husband began spending winters in Florida. At first they stayed "maybe two months," and in subsequent years, they stayed "longer and longer." They purchased a 22-foot trailer and moved into "one of the senior communities," Indian Creek Park, near Fort Myers. During spring and summer, they returned to Virginia and the Ashby Drive residence, although their time here became less as years passed.

After Honaker's husband died, she moved to Sebring, Florida, and lived with a friend, James Breslin, for four years. When Blevins was injured in this accident, she returned to Virginia and has not returned to Florida.

During the years she lived in Sebring, her car was licensed and registered in Florida. She maintained her Virginia driver's license but testified that she had become aware that she "should have changed" it to Florida, and she had "intended to do that," but this accident occurred and she returned to Virginia.

Honaker was not employed. Her sole income was her deceased husband's pension. She maintained an account at the National Bank of Fredericksburg where the pension checks were deposited by "direct deposit." Bank statements were mailed to her Florida address.

Although Honaker's Florida insurance policy does not track Virginia policy language, it nonetheless affords coverage to Honaker and residents of the same household.

> The meaning of "resident" or "residence," a prolific source of litigation, depends upon the context in which it is used . . . . Here, we must interpret the meaning of "resident" when followed by "of the same household." The word "household" . . . connotes a settled status; a more settled or permanent status is indicated by "resident of the same household" than would be indicated by "resident of the same house or apartment."

*State Farm v. Smith*, 206 Va. 280 (1965), quoted in *Allstate v. Patterson*, 231 Va. 358 (1986).

Therefore, regardless of the meaning of "residence" for tax, voting, or other purposes, its meaning in Honaker's automobile liability insurance policy connotes "a more settled or permanent status." Whether Honaker "split her residency" between Florida and Virginia thereby establishing a "dual residency" may be relevant for some purposes, but it has little or no bearing upon a decision that requires interpretation of the term "resident of the same household" as applied to facts and circumstances of a particular case.

The evidence, including Honaker's own testimony, clearly establishes that she lived in Sebring, Florida, with James Breslin at the time of Blevins' accident and had been doing so for four years prior to the accident. That residence at 10090 Willow Lane in Sebring, Florida, was her dwelling place, her usual place of abode, her place of habitation, for purposes of construing the clause under consideration.

> Further, when the term "household" or "family" is used, the term embraces a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof; a "collective body of persons living together within one curtilage, subsisting in common and directing their attention to a common object, the promotion of their mutual interests and social happiness." *Patterson, supra.*

Also, see *USAA Cas. Ins. Co. v. Hensley*, 251 Va. 177 (1996).

Thus, even if Honaker could say that the Ashby Drive address was her "residence" at least for some purposes, she certainly could not say that she was a "member of the household" under that roof. She was not part of any "collection of persons as a single group" living there. She was not a component of "a unit of domestic character" gathered within that curtilage. Her "household" consisted of herself and James Breslin in Sebring, Florida.

For these reasons, the court concludes that Blevins was not a resident of the same household as Honaker.

### *Did Blevins Reside in the Same Household as His Brother?*

Although Blevins' brother, David Blevins, spent a lot of time in Florida, he, unlike his mother, never lived there.

At the time of the accident, David had lived at the Ashby Drive residence for about ten years. His automobile is registered and licensed in Virginia. He has a Virginia driver's license. He pays personal property taxes here. His GEICO insurance policy is a Virginia policy purchased in Virginia. His personal belongings are in the Ashby Drive house. When he traveled to Florida for visits, he "traveled light." He is 43 years old and has two children who live in Maryland. He maintains no steady employment, earning money by working at "odd jobs."

His trips to Florida involved visits with his stepsister in Fort Myers during winter months. "I go down there to see her a lot," he said. "So when I go there, I don't put a timeframe on how long I'm going to be there. It could be three months, it could be six, it could be two." He always considered the Ashby drive residence as "home."

In the winter of 1994-95, David had gone to Florida to visit his stepsister. He took a job with Liberty Lawn Service, owned by a friend. During the time he worked for Liberty, he stayed with a friend in a house down the street from his stepsister's house. He was not on the lease.

At the time of the accident, David had extended his "visit" to about six months, apparently the longest he had ever stayed in Florida. According to his testimony, he was intending to return to the Ashby Drive residence because summer was approaching and also because Liberty had lost some of its lawn maintenance contracts. He came back to Virginia after Blevins' accident and presently resides in the Ashby Drive house with his mother and brother.

It is apparent that the evidence with respect to David's "residence" and "household" is quite different from that of his mother. At the time of the accident, he had lived at the Ashby Drive house for a number of years, merely "visiting" his stepsister in Florida from time to time and for varying durations. In 1994-95, he extended such a visit when he took employment with a friend and moved down the street to another friend's rented residence. Even so, he never became a resident of that address. He had no intention of dwelling there except as a "temporary sojourner" until warm weather.

Therefore, at the time of the accident, David was a resident of the same household as Blevins.